(No. 44014.

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. CHARLES CONNOLLY, Appellant.

*Opinion filed Sept. 25, 1973.—Rehearing denied Nov. 28, 1973.*

WALTER WILLIAMS, of Chicago, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS and BERRY RAND ELDEN, Assistant State's Attorneys, of counsel), for the People.

MR. CHIEF JUSTICE UNDERWOOD delivered the opinion of the court:

Defendant Charles Connolly was convicted of murder following a bifurcated jury trial in Cook County and sentenced to death. He appeals directly to this court. Ill. Const. (1870), art. VI, sec. 5; Supreme Court Rule 603, 43 Ill.2d R. 603.

On March 3, 1970, Chicago Task Force Officers Thomas Kelly and Thomas Neustrom, who were both in uniform, were assigned to patrol a "high-crime" area in an unmarked police car; specifically, they were to observe youth gang activity in the vicinity of Forestville High School. At approximately 3:00 P.M. the officers saw a group of five or six youths talking to the proprietor of a newspaper stand at 43rd Street and Vincennes Avenue. They watched the group for about a minute and then continued eastbound on 43rd Street for one block, making a "U" turn and returning to further observe the youths. Shortly thereafter the group dispersed, two of them walking to an automobile parked on South Vincennes Avenue. The officers watched them get into the car and noted that the rear license plate was wired on and that there was no city vehicle sticker affixed to the windshield,

both traffic violations. The driver of the automobile, defendant Charles Connolly, was a male Negro with processed hair, mustache and goatee, and was wearing a three-quarter-length imitation fur coat and sunglasses; the passenger, Frank Luckett, was a male Negro with a natural hair style, wearing a black cloth coat and black "floppy" hat. The officers next drove south on Vincennes Avenue to 44th Street where they positioned their squad car heading north in an alley, so as to observe movement of the green 1963 Oldsmobile into which defendant and Luckett had entered. Defendant drove the car south on Vincennes, turning west on 44th Street, past the waiting officers' position, and continued westbound. The two patrolmen began to follow and approximately one block later, at 44th Street and King Drive, the officers used a spotlight to signal the vehicle driven by defendant to pull over to the curb. Defendant stopped the car, opened his door and looked back at the patrol car; the two police officers motioned for him to continue on across the street before stopping. After pulling across King Drive, both vehicles stopped; Officer Kelly recorded the license number of the Oldsmobile and both officers walked to the driver's side of the defendant's car. They were met there by defendant Connolly, who, upon being asked for his driver's license, produced a license bearing the name "Willie Woodridge". He indicated that the vehicle registration was in the glove compartment. As the officers continued to question defendant, they noticed that his wallet contained two separate sets of identification, including two different social security cards: one with the name of "Willie Woodridge" and one with the name "Carlos Kenyatta". Defendant offered the explanation that the passenger in his car had lost his wallet and that defendant was holding his identification papers for him. At this juncture, Officer Kelly took over the interrogation of defendant and Officer Neustrom began to search the passenger and the automobile for identification. He leaned into the open driver-

side window, asked the passenger his name, and received the response "Frank Luckett"; he then reached over and patted Luckett around the waist and pocket area to determine whether he was carrying a weapon. Officer Neustrom then walked around the vehicle to the passenger side, whereupon he thoroughly searched Luckett, now out of the car, and then began to search the front seat area. As he did so, he heard Officer Kelly ask defendant whether he minded being searched. As Officer Kelly began to pat defendant down, defendant pulled out a gun and shot twice, killing the officer. Officer Neustrom, hearing the shots, turned in time to see his partner falling backwards. Defendant then turned the gun on Officer Neustrom through the driver-side window and shot him once in the left side of the chest. Defendant shot twice more, striking Officer Neustrom, as he turned, in the upper left portion of the back. After the patrolman had fallen to the floor of the automobile, defendant opened the door and pulled him into the street, pressing the gun barrel against the back of the officer's head and pulling the trigger twice; the weapon did not discharge. As Officer Neustrom, still conscious, opened his eyes and looked up at defendant standing over him, defendant began running westbound on 44th Street. The officer pulled himself up by grabbing the squad car and, after seeing that Officer Kelly appeared to be dead, attempted to chase defendant. He followed defendant to the mouth of an alley leading north to 43rd Street, ordered defendant to halt, and fired three shots at him. Defendant, then between 75 and 100 yards down the alley, pulled a second gun and fired two more shots at the pursuing officer. Officer Neustrom eventually was able to crawl back to the squad car, and after being helped into the car by a youth, summoned assistance by radio.

Later that day, police investigation of the shooting centered on a two-apartment residence located at 6543 South Wood Street in Chicago, owned by Mary Luckett, mother of the passenger in the automobile driven by

defendant. A large number of policemen had surrounded the two-story dwelling by 9:00 P.M., and efforts to persuade Connolly, whom the officers believed to be hiding inside, to surrender had failed. A number of tear-gas canisters were fired into the building, one of which ignited a small fire in the second-floor apartment. Defendant was arrested as he descended the stairs from the second floor, and the sunglasses he was carrying and a shoulder holster he was wearing were seized.

A fireman who entered the second-floor apartment to extinguish the fire was overcome by the smoke and tear gas and, after falling through a window, clung to the roof to avoid further injury. Wayne Thompson, a police officer wearing a gas mask, then entered the apartment to assist the stricken fireman and held him by the arm until a ladder was raised. Officer Thompson extinguished the fire, opened several windows, and then attempted to ascertain whether anyone else was still in the apartment. As he moved toward the entrance, he observed a trash container with two revolvers on top of some refuse; he removed the entire receptacle from the house, as well as an imitation fur coat, which was lying on a sofa and which had been described in police broadcasts throughout the day as worn by Officer Kelly's murderer. The coat later was found to contain a quantity of bullets of the same caliber as those used in the shootings.

At 11:00 P.M. that night a lineup was conducted at Michael Reese Hospital in Chicago where Officer Neustrom had undergone surgery. Six individuals were brought together before him in the intensive care unit: defendant Connolly, Frank Luckett and four Chicago police officers, previously unknown to Officer Neustrom. Officer Neustrom had identified a photograph of defendant as his attacker approximately five hours earlier. At the conclusion of the lineup, Officer Neustrom identified defendant Connolly as the man who shot him, and Frank Luckett as the passenger in the automobile.

At trial a number of occurrence witnesses, including Officer Neustrom and defendant's co-indictee, Frank Luckett, positively identified defendant Connolly as the man who killed Officer Kelly and wounded Officer Neustrom. Testifying in his own behalf, defendant admitted being stopped by the two officers while driving the Oldsmobile on 44th Street, but claimed that Frank Luckett was the man who shot both officers. Defendant further admitted that he had put a gun to the head of the wounded Officer Neustrom and pulled the trigger twice, but maintained that he had fired none of the actual shots. At the close of the guilt portion of the bifurcated trial, the jury found defendant guilty of the murder of Officer Kelly and the aggravated battery of Officer Neustrom. Following a hearing in aggravation and mitigation in which it was established that defendant was on parole from an earlier murder sentence, the jury recommended the death penalty which was imposed by the court.

Defendant now argues that: (1) execution of the sentence would constitute cruel and unusual punishment; (2) it was error to deny, because of lack of standing, his motion to suppress certain items of physical evidence; (3) the pretrial lineup as conducted was unnecessarily suggestive and thus prejudicial to defendant and the identification evidence should therefore have been excluded; (4) the trial court erred in granting his motion for a bifurcated trial; (5) it was reversible error to exclude for cause prospective jurors who were opposed to capital punishment; and (6) he was deprived of his right to trial by a jury of his peers.

We are constrained by the United States Supreme Court's decisions in *Furman v. Georgia (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726,* and *Moore v. Illinois (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562,* to hold that the death penalty as here imposed was constitutionally impermissible. (*People v. Clark (1972), 52 Ill. 2d 374, 393.*) This cause must, therefore, be remanded

for a new hearing in aggravation and mitigation and the imposition of a sentence other than death.

Before trial, defendant moved to suppress the sunglasses, holster, imitation fur coat and bullets contained therein, and the two revolvers. The sunglasses and holster were seized incident to the arrest of defendant, and it does not appear that his argument as to standing touches upon these items. Rather it is directed to those objects recovered by Officer Thompson in the second-floor apartment at 6543 South Wood Street. While defendant argues that the trial court erred in holding he had no standing to challenge the validity of the seizure, we find it unnecessary to resolve that question since the record clearly reflects that these items were lawfully seized. It is uncontradicted that Officer Thompson was in the second-floor apartment of Mrs. Luckett's daughter and son-in-law to render aid to a fireman extinguishing a fire there, as well as attempting to locate other persons possibly still in the gas-filled house. The two weapons and the fur coat there seized were known by the officer to be similar to those used in the commission of the crime and both were in plain view. (*People v. Bombacino (1972), 51 Ill.2d 17.*) Under these circumstances, seizure of this evidence by Officer Thompson was not unreasonable.

While defendant challenges the integrity of the pretrial lineup identification, no useful purpose would be served by discussing it in detail. We have repeatedly held that the existence of an independent origin will validate an in-court identification even though a previous identification procedure may have been impermissibly suggestive. (*E.g., People v. Taylor (1972), 52 Ill.2d 293; People v. Pagan (1972), 52 Ill.2d 525.*) This record shows beyond any doubt that Officer Neustrom had an excellent opportunity to observe defendant and his distinctive features before, during and after the shootings. It is apparent that his identification of defendant had an origin independent of the lineup and was properly received in evidence. *People v.*

*Speck (1968), 41 Ill.2d 177; People v. Bey (1969), 42 Ill.2d 139.*

At trial, counsel for defendant moved for a bifurcated trial on the issues of guilt and punishment. To this end he filed a number of pleadings, including: "Motion of Defendant for a Bifurcated Trial", "Suggestions for Procedure Should the Court Grant the Defendant a Bifurcated Trial", and "Procedure for Bifurcated Trial of Issue of (1) Guilt or Innocence and (2) Verdict of Death". After considerable discussion with the trial court, a procedure resembling that then utilized under California practice was agreed to by the defense. Without any assertion of prejudice resulting therefrom, defendant now argues that in granting his motion for a bifurcated trial, the trial court committed reversible error. While defendant is precluded by his agreement from now raising this issue, we additionally observe that our remandment for resentencing eliminates that part of the proceedings of which defendant now complains and obviates any possible objection he might maintain, since the trial proceedings on the issue of guilt or innocence in no way differed from the customary conduct of a criminal trial.

We turn next to defendant's argument that the systematic exclusion of jurors opposed to capital punishment, or with scruples against imposing the death penalty, was reversible error since that penalty itself has been declared unconstitutional. (*Furman v. Georgia (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.*) The United States Supreme Court in *Witherspoon v. Illinois (1968), 391 U.S. 510, 517-518, 20 L. Ed. 2d 776, 782, 88 S. Ct. 1770,* observed in this regard:

"We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In

light of the presently available information, we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was."

We reached a similar conclusion in *People v. Clark (1972), 52 Ill.2d 374,* and find defendant's argument in this case unpersuasive. He offers no additional evidence of prejudice, and it is inconceivable, on the evidence in this record, that any jury could return other than a guilty verdict.

Finally, we examine defendant's argument that the manner of summoning the venire in Cook County ultimately leads to a denial of trial by a jury of one's peers to this defendant and individuals similarly situated. Defendant concedes that the method of jury selection utilized in this case was in accordance with existing law, but suggests that it is not consistent with the ends of justice. Implicit in his observation that "the jury selected for the judgment of Charles Connolly, a black man living in the ghetto on the south side of Chicago, was one consisting of mostly white middle class persons who lived in the suburbs" is that such a jury will not render a fair and impartial verdict. In an extensive documentation of the history of the phrase "jury of peers", defendant describes as "an important element in the concept of justice" the ancient English system which was "pronounced with the intention of protecting each class in feudal society from judgment in trials by those of a different rank". While it may be argued that ours is a society marred by inequality of opportunity, to give the force of law to cultural shortcomings by institutionalizing a class system within our courts is not a desirable solution. Formal class distinctions, which still exist in other parts of the world, were thoroughly rejected by the architects of our government, and we believe that equal justice through law is an ideal to be pursued rather than abandoned. We must completely reject defendant's suggestion that juries ought to be comprised of individuals from communities of like income and race or national origin, and we conclude

430

that his jury was one selected properly under the constitutions of the United States and Illinois.

Accordingly, the judgment of conviction is affirmed and the sentence of death is vacated. The cause is remanded to the circuit court of Cook County for a hearing in aggravation and mitigation and sentence other than death.

*Affirmed and remanded, with directions.*