THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* THOMAS BLAIR, Defendant-Appellant.

(No. 55869;

First District (2nd Division)—January 22, 1974.

Dennis Cunningham, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Kenneth L. Gillis, William K. Hedrick, and Ronald T. Mendes, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The defendant, Thomas Blair, was arrested and charged with the murder of Clarence Welge. After a bench trial before the Hon. Philip J. Romiti in the circuit court of Cook County, defendant was found guilty and was sentenced to a term of not less than 60 nor more than 120 years.

Prior to trial, defendant moved the court below to dismiss the indictment returned against him by the January, 1970 Cook County grand

jury on the grounds that systematic discrimination against various sectors of the population in the selection for grand jury service, and alleged non-compliance by Cook County's jury commissioners with the statutory provisions governing the selection process (Ill. Rev. Stat. 1969, ch. 78, par. 24 *et seq.*), had resulted in an illegal grand jury; therefore, defendant alleged, the indictment handed down by the January, 1970 grand jury was void.

Similar motions to dismiss with respect to other grand juries had been brought in several cases, to which defendant was not a party, before the Hon. George Dolezal.[1] An extensive hearing was conducted relative to the grand jury question in those cases. By stipulation between the State and counsel for defendant, the evidence compiled before Judge Dolezal was allowed to be introduced in the case at bar in support of, and in opposition to, defendant Blair's motion to dismiss.. After having read the transcript of evidence, Judge Romiti, in the instant case, denied defendant's motion, concluding that the method of grand jury selection had not been so manifestly or purposefully discriminatory as to involve violations of substantial constitutional proportions.

On appeal, defendant presents three questions for our consideration: first, whether the trial court erred in denying defendant's motion to dismiss the indictment against him on the grounds that the grand jury which indicted him had been selected by unlawful and unconstitutional means; second, whether defendant, in the court below, was proven sane beyond a reasonable doubt, thus rebutting the affirmative defense of insanity interposed by defendant; and third, whether defendant is entitled to a new trial because he was denied a fair trial in the court below owing to what he claims were repeated "mistakes" made by his trial counsel.

The evidence adduced at trial by the State, in its pertinent portions, can be summarized as follows. Two of defendant's companions, Tyrone Jelks and Charles Flowers, testified, in substance, that they had accompanied defendant to a White Castle restaurant during the late evening hours of December 29, 1969; that while the three were seated at the counter in the restaurant, an argument ensued between defendant and the victim, Clarence Welge, a white, 55-year-old man; and that, according to Flowers, defendant said to the victim, who was seated across the counter, "What are you staring at?" The victim replied to the effect that he had come into the restaurant to get something to eat. Defendant, a black, 22-year-old man, then rose from his seat, approached to within a

---

[1] *People v. Watson*, Circuit Court of Cook County, Criminal Division, Indictment Nos. 69-2763; 69-3453; 69-2344; 69-3136; 69-3139; 70-295; 70-159.

foot of the victim, and the two exchanged further words. Welge grabbed defendant by the coat collar and held him, and, as he was so doing, defendant reached into his coat pocket, withdrew a pistol, and shot Welge in the left side, causing the victim to fall to one knee. Defendant then fired another shot at the victim, and, thereupon, Jelks, Flowers, and defendant left the restaurant.

Mrs. Sharon Demchuck, a waitress at the restaurant who had just completed her work shift, testified that as she entered the main section of the restaurant from a downstairs area, she saw the victim on his knees and that defendant was standing over him; that defendant and the victim were the only persons in that particular section of the restaurant; that she observed defendant leave the restaurant through a door which led to a parking lot and that he proceeded to enter an auto located in the lot; and that she left the restaurant and asked Charles Mosier, who was exiting his auto in the lot, to take down the license number of the auto she had seen defendant enter, which Mosier did.

Charles Mosier testified, in part, that he had observed a man entering an auto in the White Castle parking lot and that, upon the request of Mrs. Demchuck, he took down the auto's license number.

Officer Charles Gunn, a member of the Maywood, Illinois police department, testified, in part, that during the early morning hours of December 30, 1969, he received a police radio dispatch which gave the description and license number of an auto that carried persons who had recently been involved in a shooting; that he later observed the suspect vehicle in traffic, followed the vehicle until it came to a stop and parked, and thereupon, along with other police officers, approached the three occupants of the auto, Tyrone Jelks, Charles Flowers, and defendant, after they had exited the auto; that, after having informed the three that they were wanted in connection with an investigation of a shooting, he and defendant began scuffling; that, during the scuffle with defendant, Officer Gunn observed a pistol fall from defendant's person; and that Officer Gunn seized the pistol from the ground and subsequently sent it to the crime laboratory. It was stipulated between counsel for the defense and the State that the gun seized by Officer Gunn was the same weapon which had fired the bullets removed from the victim's, Clarence Welge's, body.

In support of his affirmative defense of insanity, defendant adduced evidence which can be summarized as follows. Defendant's mother, Mrs. Edith Mohorn, testified, *inter alia,* that when defendant was seven or eight years of age, he was involved in an auto accident and that when she observed him in the hospital after the accident, defendant was in a semi-coma; that throughout the ensuing years, defendant had behavior

problems, which included fighting in school on the spur of the moment; that defendant's fighting resulted in his being placed in reformatories, and, on one occasion which involved a fight with a police officer, the fighting resulted in his being sent to jail; that defendant complained of intermittent headaches over the years, which Mrs. Mohorn treated with aspirin; that although she sought treatment for the injury which resulted from the car accident, she was unable to obtain any; that defendant had been expelled from school a number of times; that defendant had violent fights at home with his brothers; and that when she came to see defendant after he had been arrested for the shooting at the White Castle restaurant, defendant appeared to her to be incoherent.

Defendant's former grammar school principal, Mr. Hamilton, testified that defendant had been a disciplinary problem in school. The Rev. Claude Porter, the director of a community group in Maywood, Illinois, testified that defendant had worked for him in Maywood and described defendant as being subject to explosive outbursts. Other lay witnesses, including members of defendant's immediate family, testified to various other instances of violent behavior and displays of bad temper which defendant had engaged in throughout the years they had known defendant.

Thereafter, in the court below, expert witnesses were called to testify with respect to defendant's mental condition; their testimony will be summarized as part of our resolution of that issue in point II of this opinion.

## I.

The first issue presented for review is whether the court below erred in denying defendant's motion to dismiss the indictment against him on the grounds that the January, 1970 grand jury which had indicted him had been selected by unlawful and unconstitutional means. To reiterate, the evidence presented before the trial court, both in support of defendant's motion and in opposition to it, was the same as that adduced relative to similar motions made on behalf of several defendants in other cases, in the circuit court of Cook County, regarding the selection of grand juries which had indicted the respective defendants. In the instant case, the trial court, after reviewing the voluminous evidence, concluded that the method of grand jury selection had not been so purposefully discriminatory as to involve violations of substantial constitutional proportions. Thus, the trial court refused to dismiss the indictment against the defendant Blair.

Specifically, it is defendant's seminal contention that the grand jury which indicted him was illegal owing to what he claims was unjustifiable

under-representation of Negroes, Latins, women, young adults, and poor people. In support of this argument, defendant calls our attention to the Fifth and Fourteenth Amendments to the United States Constitution, which forbid discrimination on the basis of race, sex, age, or income in the selection of grand or petit juries, or any discrimination resulting in the partial exclusion or under-representation of any identifiable segment of the community from which jurors are to be chosen.

Furthermore, defendant asserts, certain practices of the Cook County jury commissioners enhance the under-representation on grand juries of certain groups in the general population. He points specifically to these practices: the exclusive use of registered voter lists as the source of prospective jurors; the daily fee of ten dollars paid by the County for jury service; the failure of the commissioners to maintain jury lists; the variance in the methods used to select petit as opposed to grand jurors; and certain criteria individually applied by the commissioners in the selection of grand jurors.

We note at the outset of our analysis that in the record of evidence submitted on this issue to Judge Romiti in the court below—the same record we have before us now—there is a definite paucity of evidence with respect to the composition and selection of the January, 1970 Cook County grand jury, the grand jury which indicted the defendant in the case at bar. None of the grand jurors who served thereon were called as witnesses either before Judge Romiti or before Judge Dolezal in the prolonged hearing on the issue of improper grand jury selection in cases involving several different defendants. While much of the evidence is highly complicated, demonstrative, and statistical, the record filed in this court contains none of the nearly twoscore exhibits which were either introduced by the defense before Judge Dolezal and accepted into evidence, or which were introduced and rejected. We can, however, at times, glean from the transcript of colloquy between court and counsel some of the particulars which the exhibits reflected; but we are hard put to do so regularly.

In our reading of the record, and the abstract of same provided by counsel, we found references to the following defense exhibits—without the particular exhibits to accompany them—which could have peculiar significance in relation to the composition of the January, 1970 grand jury: Defense Exhibit No. 38, which purported to be a photograph of the January, 1970 Cook County grand jury; Defense Exhibit No. 13, entitled "Stipulation To Accuracy of 1970 Grand Jury List," which purported to fully and accurately describe the names, ages, occupations, business or residential addresses of all persons whose names were drawn on December 1, 1969, for regular or supplemental grand jury service

commencing January 5, 1970; and Defense Exhibit No. 14, entitled "Stipulation To Testimony of Certain Grand Jurors," which reflected that one Jewel Spencer had served on the January, 1970 grand jury and that there were three Negroes serving on that grand jury.

The evidence submitted with respect to defendant's motion to dismiss the indictment reveals that several former grand jurors, all of whom had served on various Cook County grand juries during the year of 1969, were called as defense witnesses to testify regarding their grand jury experiences. Because these witnesss were asked substantially the same questions during their respective appearances, we will summarize their testimony in a collective fashion, drawing important distinctions and noting conflicts therein as we proceed.

All testified that they had served on grand juries during 1969, and that prior to their service, they had each been summoned to an interview with a Cook County jury commissioner. In response to the question of how many Negroes sat on the respective grand juries upon which they served, the witnesses responded, variously, that none, one, two, or four Negroes sat on the juries.

Regarding the interviews they had with Cook County jury commissioners, the witnesses testified that the interviews lasted anywhere from two to 30 minutes. During the interviews, the witnesses were asked, *inter alia,* these questions, to which they responded either yes or no, or gave a more amplified answer: whether jury service (that is; jury service generally; the commissioners did not specify *grand* jury service) would be a hardship to them; whether they had a preference as to the time of year they might serve; whether they favored capital punishment; whether (this, in the case of one witness) he had ever been arrested; and general questions regarding their addresses, ages, occupations, and so forth.

The record relative to defendant's motion to dismiss further reveals that Cook County's three jury commissioners at the time, Herbert Lewis, Roy C. Olin, and Joseph Robichaux (a black person), were called to testify, Lewis as a witness for the defense, Olin and Robichaux as witnesses for the State.

Lewis [2] testified that he had been a jury commissioner in Cook County since July, 1953; that poll sheets listing registered voters living on certain streets in designated electoral locations were used by the commissioners to determine which persons in the County were to receive jury questionnaires; that a random "key number"—any numeral—was provided each

---

[2] The testimony of Lewis was more extensive than that of the other two commissioners. Hence, his testimony is set forth in greater detail.

year by Judge Harold G. Ward, presiding judge, law division, circuit court of Cook County, and was utilized as a reference point from which to count down the names on the voter lists in order to select prospective jurors; that every two years, the jury commissioners would receive new poll sheets from the City of Chicago and Cook County election commissioners, which represented one poll sheet for each precinct in Cook County; that "distant numbers" were used to count a certain number of names after the "key number" which allowed the commissioners to arrive at the names of prospective jurors; that after these names were selected, questionnaires—approximately 21,000 per month and 400,000 over a two year period—were sent out of those selected; that after the questionnaires had been returned, a "record book sheet" would be used to indicate those persons who had been selected for jury service, those who had been excused, and those from whom no questionnaire had been received; and that it was impossible to call anyone for jury duty from whom a questionnaire had not been received.

Lewis further testified that after the questionnaires had been returned, they would be date-stamped and divided equally among the three commissioners, who would then, individually, review his share to determine whether a person would be considered for jury service or excused "for good cause shown" based upon the answer to questions propounded on the returned questionnaire; that he would use his own discretion in deciding who was eligible for jury service and who was to be excused; that his decision to accept a person for jury duty was based solely on the answers to the questions on the questionnaire; that, in addition to excusing those who would be subject to the legal exemptions listed on the back of the returned questionnaire (see Ill. Rev. Stat. 1969, ch. 78, par. 4), he would excuse from service the following persons: women with children 13 years of age or less, who could not find someone to care for them; women who stated they were ill and under a doctor's care; women who stated they cared for invalids in need of constant care; women whose husbands were ill and who worked part time; persons who stated that they would be leaving the State within a short period of time; self-employed men who claimed that they would have to close down their businesses because of jury duty; men with several minor children, who suffered under the strain of doctor bills, mortgage payments, and so on; and various other persons who, on the returned questionnaire, stated a meritorious cause.

Continuing, Lewis stated that he, personally, would excuse approximately two out of three persons who returned questionnaires; that a person who answered "no" to the question, "Do you read, write, and understand the English language?" would be excused; that persons who

responded that they had lived in the State one or two years would be acceptable for petit jury service and those who responded that they had lived in the State three or four years would be acceptable for grand jury service; that he read every answer on each questionnaire; that while in the process of sifting through the questionnaires, he would set aside those with whom he would wish to speak concerning grand jury service; that, in setting aside those questionnaires, he would consider two things: covering the County as well as he could and avoiding having too many persons for the same industry; that those persons selected for possible grand jury duty were sent a post card indicating the time and day on which the commissioner would like to interview the person; that after the persons were interviewed, he would decide whose cards were to be placed in the grand jury "draw box"; and that there were no indications on any of his office records of the race, national origin, or level of wealth of either those listed on the registered voter lists or those persons selected for card placement in either the petit or grand jury draw boxes.

Under cross-examination, Lewis testified that he made no check as to the racial origin, ethnic background, age, of income of potential jurors; that there was no screening of grand jurors after they had been selected; that he had never excused anyone because he or she was a Negro, of Spanish speaking ancestry, between the ages of 21 and 30, of low income, or lived in a particular ward of the County; that he tried to minimize inconvenience to the citizens in the selection process; and that he had never been instructed concerning the type of person to be selected for grand jury service by the State's Attorney, or any judges or officials of the State, the County, or the City of Chicago.

In reviewing Roy C. Olin's testimony, we find two statements of importance when set against the testimony of Commissioner Lewis: that Olin would excuse persons who responded on the questionnaire that they did not understand the English language, and that only those persons who could serve on juries at any time would be considered for grand jury duty. With respect to Robichaux's testimony, we find it significant that he stated he would excuse any person from jury service who could not read or write the English language.

The evidence presented a statistical study of the population of Cook County and of the composition of the various Cook County grand juries for January, 1968 through December, 1969. (We have previously referred to the lack of the record for the January, 1970 grand jury.)

Defendant contends the evidence showed systematic exclusion which led to the under-representation of black, latin, young (ages 21-30), and poor people, along with women, on all of the grand juries in Cook County from January 1969 through January, 1970, save one special grand jury

not included in the study. Briefly, defendant asserts the evidence proved that black people made up 19% of the population of the County, 15% of the registered voters, and only 6.6% of the grand jurors: 37 out of 575 grand jurors were black. Latins were 4% of the population, 1.5% of the registered voters, and just over two-tenths of one percent—three persons out of 1,118 grand jury panelists—of those selected. Women, who made up over half the population and over half the registered voters, held less than one-third of the places on those grand juries. People between the ages of 21 and 30, 18.7% of the population (and 13% of a sample of petit jurors), were less than four-tenths of one percent—five out of 1,118—of those drawn for grand jury service during the period. As to the poor, the people who lived in the one-fourth of all Chicago census tracts (1960 figures) which showed the lowest per capita income, who were 12% of the adult population of the County, were 3.6% of the panelists —41 out of 1,118—chosen for grand jury service.

Albert Lawrence, assistant professor of mathematics at Northwestern University, an expert in probability theory, testified that, in each category, the odds against these results flowing by mere chance from an equitable system of selection from among the population of registered voters were astronomical.

The Illinois statute which governs the drawing, summoning, and examining of jurors in Cook County is chapter 78, 1 *et seq.*, of the 1971 Illinois Revised Statutes. The sections of that chapter which govern the conduct of the offices of jury commissioners in Cook County are sections 24, *et seq.* Under section 25, the commissioners are required, among other things, to prepare lists of legal voters (a general jury list) of each town or precinct of the county possessing the necessary legal qualifications for jury duty as set forth in section 2 of chapter 78. The legal qualifications are: (1) that jurors be inhabitants of the town or precinct, not exempt from serving on juries (see Ill. Rev. Stat. 1971, ch. 78, par. 4); (2) that they be of the age of 21 [3] years or upwards; (3) that they be in the possession of their natural faculties and not infirm or decrepit; and (4) that they be free from all legal exception, of fair character, of approved integrity, of sound judgment, well informed, and who understand the English language.

Pursuant to section 31 of chapter 78, the commissioners are to prepare an active jury list, containing such number of names taken from the general jury list specified in section 30 to amount to not less than 5% of the aggregate names on the general jury list, and, in addition, are to

---

[3] Public Act 78-199, approved July 18, 1973, effective October 1, 1973, amended ch. 78, par. 2 to permit jurors of the age of 18 years or upwards.

prepare period jury lists. These lists are to contain the names of prospective jurors who have indicated at what time of the year they could most conveniently serve. The lists are to be prepared in such a manner as to ensure, as near as may be, a proportional representation of the whole body of electors in respect either of their occupations or of the particular localities where they reside.

Section 32 prescribes the method of drawing petit and grand jurors:

"The chief judge of the circuit court of the county shall certify to the clerk of the court the number of petit jurors required each month. The clerk shall then repair to the office of the jury commissioners and there, in the presence of the persons mentioned in Section 8 of this act [Section 31 of Chapter 78], proceed to draw by lot the necessary number of names from those made available for such drawing as in Section 8 of this act provided. The clerk shall thereupon certify to the sheriff the electors whose names are so drawn, to be summoned according to law. If more jurors are needed during the month, a judge of the court shall so certify, and they shall be drawn and certified forthwith in the manner above provided. Whenever a grand jury is required by law or by order of the court, it shall be drawn and certified in like manner."

■■ Appropriate in the consideration and evaluation of the statutory provisions applicable to jurors and jury commissioners is the significant case of *People v. Lieber* (1934), 357 Ill. 423, 192 N.E. 331, wherein our supreme court diagnosed and evaluated the legislative history and intent of chapter 78. In *Lieber*, at page 436, it was held that the statutory requirements relating to the number and selection of grand juries "are directory and not mandatory, unless the substantial rights of the accused are injuriously affected by the methods pursued." At page 437, *Lieber* further pronounced that:

"[A] substantial compliance with the law providing for the drawing and impaneling of a grand jury is all that is required unless the record shows improper influence, undue prejudice or other matters which might have caused a true bill to be improperly returned."

This construction was recently referred to by our supreme court in *People v. Petruso* (1966), 35 Ill.2d 578, 581, 221 N.E.2d 276.

The Jury Commissioners Act was also discussed in great detail in *People ex rel. Lasecki v. Traeger* (1940), 374 Ill. 355, 29 N.E.2d 519. In *Traeger*, a mandamus action involving the provisions of the act in the selection and drawing of grand jurors, this State's supreme court held that the conferring of authority on the jury commissioners to determine, from the active jury list, who shall serve as grand jurors does not author-

ize unjust discrimination. Likewise, the act of the commissioners to interrogate prospective jurors concerning qualifications and eligibility for jury service is not, of itself, violative of the jurors act.

At this point it should be noted that sections 30 and 31 of the Jury Commissioners Act refer to rules to be adopted by a majority vote of the judges of the county. Defendant has not pointed out any rule to which he objects. We, therefore, do not consider, in this appeal, the contents or propriety of any said rules.

It is our opinion that defendant must demonstrate that the record established that the procedure followed by the commissioners violated substantial rights of the defendant.

■■ Defendant's burden, then, in the court below was to make out a prima facie case of purposeful discrimination in the selection processes employed by the jury commissioners which resulted in the systematic exclusion of Negroes, women, Latins, young adults, and poor people from the January, 1970 grand jury which had indicted him. We agree with the court below that defendant failed to sustain the burden of making out a prima facie case of purposeful discrimination of substantial constitutional proportions, and, thus, the trial court did not err in refusing to dismiss the indictment against him.

■ At one point in defendant's brief on appeal, he contends that the portion of the Illinois statute which prescribes the "standards" to be met by citizens to qualify for jury service is so vague and indefinite as to be unconstitutional on its face. We do not agree, and, accordingly, reject the argument. See *Carter v. Jury Com. of Green County* (1970), 396 U.S. 320, 331-337, 24 L.Ed.2d 549, 90 S.Ct. 518.

Turning to defendant's argument that the grand jury which indicted him was illegally composed and selected in violation of the Fifth and Fourteenth Amendments to the United States Constitution, which forbid discrimination on the basis of race, sex, age, or income in the selection of grand or petit juries, the United States Supreme Court stated, at pages 549 and 550, in *Whitus v. Georgia* (1967), 385 U.S. 545, 17 L.Ed.2d 599, 87 S.Ct. 643:

> "For over fourscore years it has been federal statutory law, 18 Stat. 336 (1875), 18 U.S.C. § 243, and the law of this Court as applied to the States through the Equal Protection Clause of the Fourteenth Amendment, that a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race. *Strauder v. West Virginia*, 100 U.S. 303 (1880); see also *Pierre v. Louisiana*, 306 U.S. 354 (1939). There is no controversy as to

the constitutional principle—the question involved is its application to the facts disclosed in this record."

The *Whitus* Court went on to state further:

"The burden is, of course, on the petitioners to prove the existence of purposeful discrimination, *Tarrance v. Florida,* 188 U.S. 519 (1903). However, once a prima facie case is made out the burden shifts to the prosecution." See *Whitus* at page 550.

See also *People v. Powell* (1973), 53 Ill.2d 465, 477-78, 292 N.E.2d 409 and *People v. Connolly* (1973), 55 Ill.2d 421, 303 N.E.2d 409.

While defendant cites numerous cases in his briefs before this court, his principal reliance is upon five United States Supreme Court cases, in all of which the Court found purposeful discrimination which led to systematic exclusion. They are: *Avery v. Georgia* (1953), 345 U.S. 559, 97 L.Ed. 1244, 73 S.Ct. 891; *Whitus v. Georgia, supra; Carter v. Jury Commission of Greene County, supra; Turner v. Fouche* (1970), 396 U.S. 346, 24 L.Ed.2d 567, 90 S.Ct. 532; and *Alexander v. Louisiana* (1972), 405 U.S. 625, 31 L.Ed.2d 536, 92 S.Ct. 1221.

In *Avery,* the Supreme Court reversed a judgment of conviction where the names of prospective petit jurors had been printed on differently colored tickets according to their race. White tickets were used for white persons, yellow tickets for Negroes. The Court found that the use of the different colored tickets made it easier "for those to discriminate who are of a mind to discriminate," (*Avery, supra,* at 562) and that there existed opportunities at other stages of the selection process to resort to discrimination. *Whitus* involved a refinement of the process which had been condemned in *Avery.* In *Whitus,* the jury commissioners drew up a jury list from which jurors were selected by reference to a tax digest, which was segregated into sections, one with white sheets for white people and the other with yellow sheets for Negroes. The supreme court found that the opportunity for discrimination was present under such a system, and, *based upon the record before it,* the Court could not say that the commissioners involved had not resorted to the opportunity (*Whitus, supra,* at page 552). Both *Avery* and *Whitus* involved physical, mechanical aspects of the jury selection process which, it was found, could have had no purpose other than to enable those so disposed to discriminate on the basis of race.

In *Alexander,* the petitioner, a Negro who had been convicted of rape in Louisiana, contended that the grand jury selection procedures adhered to in his case were individiously discriminatory against Negroes and women. In *Alexander,* a mailing list for grand jury questionnaires was compiled from nonracial sources, and although there was no evidence

that the Louisiana jury commissioners, all of whom were white, had consciously selected grand jurors on the basis of race, the racial identification of prospective grand jurors who had answered questionnaires were known to the commissioners when they made their selections, and although 21.06% of the parish's adult population was Negro, only 13.76% of the persons returning grand jury questionnaires to the commissioners were Negro, 6.75% of the persons ultimately selected as prospective grand jurors were Negro, none of the 12 persons of the grand jury which indicted the petitioner was Negro, although 5% of the grand jury venire was Negro. The *Alexander* Court found the grand jury selection procedures in Louisiana unconstitutional on grounds of racial discrimination and having done so abstained from deciding any constitutional issue raised in connection with the alleged exclusion of women from the grand jury service.

The *Alexander* Court stated, at page 630:

"The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest out conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for the selection procedures themselves were not racially neutral. The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination. At two crucial steps in the selection process, when the number of returned questionnaires was reduced to 2,000 and when the final selection of the 400 names was made, these racial identifications were visible on the forms used by the jury commissioners, although there is no evidence that the commissioners consciously selected by race."

In the case at bar, none of the types of selection procedures which were found to have led to systematic exclusion of certain groups of jurors in *Avery*, *Whitus*, and *Alexander* are present. We find nothing in the methods of selecting juries, as presented by the evidence in the case before us, to indicate the use of any physical, mechanical means (such as the yellow and white tickets of *Avery;* the yellow and white tax sheets of *Whitus;* or the racial designations on the cards and questionnaires of *Alexander*) to exclude prospective jurors. These cases are inapposite.

Both *Carter* and *Turner*, civil actions, involved attacks upon portions of jury selection statutes, in Alabama and Georgia, respectively, the implementation of which, it was claimed, led to the systematic exclusion of qualified Negroes from jury service. In *Carter*, the Court found that the Alabama statute as to the selection of jurors was not unconstitutionally discriminatory on its face, but upheld the three judge district court's

finding that there had been systematic discrimination in the preparation of jury lists and directed the preparation of a new list in accordance with the laws of Alabama and constitutional principles. In *Turner*, it was held that the appellants therein had, in a lower court, demonstrated that a substantial disparity between the percentages of Negro residents in a county as a whole and of Negroes on a certain jury list had originated at one point in the selection process where the jury commissioners invoked subjective judgment rather than objective criteria.

■■ Based upon a reading of the record before us, we find that defendant herein did not show in the court below substantial deviations from the statutory scheme used by Cook County's jury commissioners which led to discriminatory exclusion. We further hold that the defendant herein did not demonstrate, upon the record, that the origin of any disparity in percentages of the Negroes on the January, 1970 Cook County grand jury was the subjective judgment of the jury commissioners rather that objective criteria.

## II.

Next, defendant asserts that he was not proven sane beyond a reasonable doubt, thus rebutting the affirmative defense of insanity interposed by defendant. In support of his argument on this point, defendant contends that he is entitled to a new trial because, he claims, it was not shown in the court below that defendant was legally sane beyond a reasonable doubt and, therefore, criminally responsible for his actions. Defendant further urges that he was denied his constitutional right to due process of law owing to the receipt into evidence in the trial court of what he considers improper "expert opinion" of his guilt.

■■ It is manifest from a reading of the cases in this State that the burden of proof on the issue of a defendant's sanity is always upon the prosecution, and if the question of sanity is properly raised, it must be proved by the State beyond a reasonable doubt (*People v. Gold* (1967), 38 Ill.2d 510, 514, 232 N.E.2d 702; *People v. Burress* (4th Dist. 1971), 1 Ill.App.3d 17, 18, 272 N.E.2d 390; and *People v. Lassiter* (1st Dist. 1971), 133 Ill.App.2d 353, 273 N.E.2d 166). Whether the State has sustained its burden of proving defendant's mental condition at the time of the commission of the crime is a question of fact to be determined by the trier of fact (*People v. Myers* (1966), 35 Ill.2d 311, 325, 220 N.E.2d 297; and *People v. Burress, supra*, at pages 18-19), and where a defendant, as in the case at bar, avails himself of the right to waive a trial by jury, the court becomes the trier of fact, fully competent to determine the issue of sanity. *People v. Muniz* (1964), 31 Ill.2d 130, 136-137, 198 N.E.2d 855; and *People v. Lassiter, supra*, at page 356.

■■ In maintaining its position as trier of fact, the court is, in addition, the determiner of the weight and credibility to be given the testimony of psychiatrists who are called to testify on the issue of a defendant's sanity (*People v. Count* (1st Dist. 1969), 106 Ill.App.2d 258, 246 N.E.2d 91). Moreover, a finding of sanity by a trial court should not be disturbed unless the finding was so palpably against the weight of the evidence adduced before the court as to indicate that it was based upon passion or prejudice. *People v. Thomas* (1951), 409 Ill. 473, 100 N.E.2d 588; and *People v. Lassiter, supra,* at page 356.

Regarding the expert testimony elicited at trial concerning defendant's mental condition, Dr. Marvin Ziporyn, at the time chief psychiatrist at the Illinois State Training School for Boys at St. Charles, Illinois, and formerly chief psychiatrist for the Cook County Jail, testified for the defense. Dr. Ziporyn stated, in salient portions, that he had examined defendant some months prior to trial for approximately one hour; that he had propounded questions to defendant relative to defendant's biographical background, the crime with which he was charged, his orientation, cognitive abilities, and his attitudes and feelings with respect to the situation in which defendant found himself; that, based upon defendant's responses to the propounded questions, upon the results of two psychological tests administered by Vivian Cheatham, a psychologist associated with Dr. Ziporyn, and upon his observations of defendant, Dr. Ziporyn diagnosed defendant as suffering from nonpsychotic organic brain syndrome, which was associated with cerebral trauma; that defendant had a peculiar gait and displayed frequent twitches and grimaces of the facial musculature; that there was a good deal of paranoid coloring in defendant's attitude toward the world; that defendant showed no difficulty in his apperception or cognitive abilities; and that one who suffered from the type of brain damage diagnosed in defendant would be emotionally instable, have difficulties in calculation, fund of knowledge, and memory, and difficulties in judgment and insight.

Based upon a hypothetical question propounded to Dr. Ziporyn concerning a hypothetical man's actions at the time of a shooting, he further testified that while the hypothetical man did not lack substantial capacity to appreciate the criminality of his conduct, it was the doctor's opinion that the man lacked substantial capacity to conform his conduct to the requirements of the law.

Vivian Cheatham, at the time a clinical psychologist employed by the Chicago Board of Education and an associate of Dr. Marvin Ziporyn, testified for the defense. She stated, in pertinent part, that she had administered four psychological tests to the defendant some months prior to trial; that the tests administered were a "draw-a-person" test, a

"thematic apperception" test, a Rorschach Ink Blot test, and a Bender-Gestalt test; and that, based upon her interview with the defendant and the results of the tests, it was Ms. Cheatham's impression that defendant needed further study, that he was "barely possibly" a brain damaged individual, and that further exploration should be undertaken by medical experts.

Dr. Robert deVito, at the time of defendant's trial a psychiatrist who was the superintendent of Madden Mental Center, was called as a witness by the State. Dr. deVito testified, *inter alia*, that he had examined defendant for approximately one hour and 45 minutes some two months prior to trial, and that, in addition to an interview concerning defendant's mental status and developmental background, he had administered tests to defendant, which included batteries of questions to test defendant's memory; his orientation to time, place, persons, situation, and space; and his intellection and emotion; that his conclusions, based upon defendant's answers to the questions, were that there was no evidence whatsoever of an organic brain syndrome; that defendant was able to recall events very well; that defendant showed fairly good judgment and that defendant was able to calculate certain arithmetic problems posed to him; and that defendant displayed a range of emotion which was within normal limits.

Dr. deVito went on to state that his diagnosis of defendant was a paranoid personality with explosive elements; that is, an individual who, over a period of time, had been very embittered in life, angered easily, was suspicious of people, but, who, basically, was fully in control of himself, though also given to periodic outbursts of violence. Dr. deVito further testified that defendant did not suffer from a mental disease or defect, but, rather, from a personality disorder. In answer to a question based upon a hypothetical set of facts, he stated that the hypothetical man at the time of the shooting did not lack the substantial capacity to appreciate the criminality of his conduct and could have conformed his conduct to the requirements of the law.

Dr. Ben Schuman, a psychiatrist in private practice, who, at the time of defendant's trial, was retained by the Board of Health of the City of Chicago, was called as a defense witness. Dr. Schuman testified that he had never had the occasion to examine or interview the defendant. In response to a hypothetical set of facts read to him, Dr. Schuman concluded that the man in the hypothetical could be diagnosed to suffer from minimal brain damage and a personality disorder. Under cross-examination, Dr. Schuman stated that it was possible in certain cases that one who suffered minimal brain damage and worked under a personality

disorder would be able to know the difference between right and wrong and to conform his conduct to the requirements of the law.

Defendant, in his brief, asserts that Dr. deVito's observations and testimony did not disprove the existence of some organically based psychopathology beyond a reasonable doubt; in fact, defendant continues, the question of whether defendant was unable to control himself is an unconstitutional question, because, to defendant's thinking, it denies due process of law by influencing the trier of fact with an expert's pretense of "knowing the unknowable," in defendant's phrase. Consequently, defendant attacks as unconstitutional the application of chapter 38, section 6—2 of the Illinois Revised Statutes (Ill. Rev. Stat. 1969, ch. 38, par. 6—2) in that the statute which defines insanity allows the practice of taking expert opinion ("guesses," to use defendant's word) with respect to the ultimate fact issue presented.

In *People v. Covey* (1966), 34 Ill.2d 195, 215 N.E.2d 220, our supreme court had occasion to direct its inquiry to the question of the permissibility of eliciting expert psychiatric opinion in circumstances analogous to those present in the matter before this court. In holding that an examining psychiatrist, in testifying at a hearing to determine if defendant was a sexually dangerous person, may give an opinion based upon facts and knowledge derived from his examination of the defendant, the court stated at page 197 of the *Covey* opinion:

"At the conclusion of his testimony the psychiatrist stated he would classify defendant as sexually dangerous 'under the new statute,' and it is now urged that such testimony invaded the province of the court, as the trier of fact, since it was an opinion as to the ultimate fact in issue. We find, however, that there has in recent years been a marked relaxation in the opinion rule, particularly in cases dealing with medical education and medical capacity, [citations] and we believe that proceedings of the present character fall within the area where relaxation is proper. While the question of whether an individual is a sexually dangerous person is one of fact, it is one which, by its nature, cannot be answered by a court or jury without hearing the opinions of those having peculiar and special knowledge in the fields of mental disorder and sexual aberration. In any event, as given in this case, the opinion of the psychiatrist was nevertheless an opinion only, and it still remained the function of the court to determine the issue from all the facts before it."

Defendant, in the case at bar, was examined by two qualified psychiatrists and by a clinical psychologist; in addition, expert opinion was given by Dr. Schuman, who, while he had not examined defendant, was

able to testify with respect to the hypothetical individual who was the subject of the question propounded. Each of the psychiatrists felt that his respective examination of defendant was adequate to allow him to express an opinion as to defendant's mental capacity at the time the crime was committed. The qualifications, opinions, and the foundations for opinions of all the expert witnesses were very thoroughly explored in strenuous cross-examination. Their testimony, which covers some 280 pages in the record, appears to have presented everything that could have been presented on the issue to the trial court, who, in this case, sat as the trier of fact. ·

The court below was presented with an abundance of testimony on the issue by four experts in their respective fields, as well as the testimony of several lay witnesses, and though there was conflict among the experts with respect to defendant's sanity, the court resolved the issue against the defendant. After a careful, thoroughgoing review of the expert and lay testimony adduced at trial in this cause, we are of the opinion that the trial court was entirely justified in finding defendant sane at the time of the commission of the crime with which he was charged. We find, therefore, that defendant was proven sane beyond a reasonable doubt and that defendant was not denied his constitutional right to due process of law because of the receipt into evidence in the court below of "expert opinion."

## III.

Defendant, who is represented on this appeal by the same counsel who represented him at trial, next asserts that he is entitled to a new trial because he was denied a fair trial in the court below owing to repeated "mistakes" made by trial counsel. He refers, in his brief, to "tactical errors and failures of understanding on the part of defense counsel," and enumerates the following among them: failure of counsel to understand that "* * * the Court's whole attitude would necessarily be geared *against* humane understanding * * * and towards the standard presumption of guilt"; failure to understand the consequences of a jury waiver in a case of this nature; failure to call defendant as a witness in his own behalf; failure to call a particular witness; insufficient cross-examination of the expert witness called by the State, Dr. Robert deVito; and other matters.

Our supreme court in *People v. Goerger* (1972), 52 Ill.2d 403, 288 N.E.2d 416 stated, at page 409:

> "In order to establish lack of competent representation at trial, it is necessary to demonstrate 'actual incompetence of counsel, as reflected by the manner of carrying out his duties as a trial at-

torney' which results in substantial prejudice without which the outcome would probably have been different." Citing *People v. Dudley* (1970), 46 Ill.2d 305; *People v. Stepheny* (1970), 46 Ill.2d 153; *People v. Georgev* (1967), 38 Ill.2d 165; and *People v. Morris* (1954), 3 Ill.2d 437.

Furthermore, the question of whether a defendant was adequately represented by competent counsel must be answered solely from the circumstances of each particular case. *People v. Francis* (1934), 356 Ill. 74, 77, 190 N.E. 106; see also *People v. Cox* (1961), 22 Ill.2d 534, 538, 177 N.E.2d 211; and *People v. Georgev* (1967), 38 Ill.2d 165, 169, 230 N.E.2d 851.

■■ This court, in *People v. Travis* (1st Dist. 1973), 10 Ill.App.3d 714, 295 N.E.2d 325, discussed at some length the standards to which adherence must be given when claims of irreparable prejudice because of ineffective assistance of counsel are made. We said at page 717 in *Travis*:

> "Where a defendant in a criminal case employs private counsel, his conviction will not be reversed merely because his counsel failed to exercise the greatest skill, or for that reason that it might appear in looking back over the trial, that he made some tactical blunders. (*People v. Stephens*, 6 Ill.2d 257, 128 N.E.2d 731; *People v. Lenker*, 6 Ill.App.3d 335, 285 N.E.2d 807.) Defendant must demonstrate the actual incompetence of his counsel and it must appear that substantial prejudice resulted therefrom, without which the outcome would probably have been different. (*People v. Hill*, 44 Ill.2d 299, 255 N.E.2d 377.) A conviction will not be reversed unless representation was of such low caliber as to amount to no representation at all, or that it was such as to reduce the trial to a farce. *People v. Strader*, 23 Ill.2d 13, 177 N.E.2d 126; *People v. Clark*, 9 Ill.2d 46, 137 N.E.2d 54, *cert. denied*, 352 U.S. 1002, *rehearing denied*, 353 U.S. 931."

Defense counsel's preparation and presentation in the court below was far from incompetent. Indeed, a reading of the record shows that he had assiduously prepared an enormously difficult case, conducted cross-examination with tenacity and insight, and generally held himself in good stead. Certainly, in the instant case, it cannot be said that defense counsel's handling of the trial resulted in substantial prejudice to his client, the defendant.

We hold, therefore, that defendant was not deprived of a fair trial in the court below, and, thus, that he is not entitled to a new trial.

Judgment affirmed.

STAMOS and LEIGHTON, JJ., concur.