(No. 42468.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. GREGORY TAYLOR, Appellant.

*Opinion filed September 20, 1972*

PAUL E. PLUNKETT, of Chicago, appointed by the court, for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and EDWARD V. HANRAHAN, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and ELMER C. KISSANE and NICHOLAS D.

TAUBERT, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE DAVIS delivered the opinion of the court:

The question for determination in this case is whether the in-court identification of the defendant by certain witnesses was based on unfair and improper pretrial confrontations.

The defendant, Gregory Taylor, after a bench trial in the circuit court of Cook County was found guilty of murder and was sentenced to the penitentiary for a period of not less than 35 nor more than 70 years. His trial was severed from that of Clyde Gunn, his co-defendant.

There were three eyewitnesses to the offense. The first, Cornelius Butler, brother of the deceased, testified that on June 22, 1967, after he and his brother finished work at midnight, they went with Jimmy Smith, Lucius Washington, Jessie Smith and "Tobey" for a beer. After parking their car, they walked toward the tavern. "Tobey" and Lucius Washington were in front, the witness and his brother in the middle, and Jessie Smith and Jimmie Smith were behind the Butlers, all about a yard apart. As they neared the tavern, a tall and a short man approached them. The witness stepped aside to let them pass, then heard scuffling and turned around. He related that he saw the short man beating Jessie Smith on the head and saw the defendant fire two shots from a sawed-off, double-barrel shotgun. The witness's brother, Willie, fell, and the witness, pursued by the defendant, ran around the corner into an alley. He said that he saw the defendant reload the shotgun in the alley, and that he then ran the other way. Later he returned to the scene where he found his brother bleeding from the chest.

The police arrived soon and transported the witness and his brother to the hospital where the brother was pronounced dead. The witness was then taken to a small

room in a police station where some officers and the defendant were present. When asked if he could identify the defendant, he did so. The defendant was wearing the same loud "between yellow and orange" silk T-shirt with dark pants that the witness had observed at the scene of the shooting. He saw the defendant again upstairs in the police station and the other witnesses were also present. The witness stated that there were lights at the scene of the shooting just over the defendant's head, and that he stood 10 or 15 feet from the defendant when the shots were fired. In court, the witness identified the defendant as the tall man and said he saw his face at the time of the shooting.

The second eyewitness, Jessie Smith, related the same preliminary events to the point where the defendant and his companion passed the group. He identified the defendant in court, and stated that Clyde Gunn, the defendant's companion, pulled the witness into a vacant lot and hit him two or three times on the back of the head with the barrel of a pistol. He testified that he heard two shots but did not see who fired them; that the defendant then said to Gunn, "Why don't you kill that nigger?"; that Gunn put the pistol to the witness' head and pulled the trigger three times, but it failed to fire; that Gunn then ordered the witness to give up his money, which he did; and that the defendant then took his house keys from his pocket, after which the defendant and Gunn fled. The witness was taken to the hospital for medical aid, and while he was there the police produced the defendant and asked, "Was this the one?" The witness identified the defendant there, and later at the police station. He also described the orange shirt which the defendant wore, and the sawed-off, double-barrel shotgun which he used. At the trial, when asked if there was anything unusual about the two men which he noticed as they passed the group, he said, "I know him. I have seen him, but I didn't know his name. I seen that face."

Jimmie Smith, the third eyewitness, recited the same preliminary events leading up to the shooting, and stated that as they approached the tavern they met two men, one of whom he identified in court as the defendant; that the men bumped against the first one or two people in their group; that as he stepped aside, he heard Jessie Smith say, "Hey fellow, what's wrong with you? I don't even know you"; that as he jumped aside and whirled around, he saw Gregory Taylor with a sawed-off shotgun, and heard two shots. He stated further that the defendant wore an orange T-shirt; that he saw the defendant shoot at him; that the lighting conditions were good; that there was a lighted sign on the tavern as well as illuminated street lamps; and that he ran into the tavern and when he came out he saw the body of Willie Butler. He also said that he drove to the hospital with the others; that a second call for the police was made while they were getting started to the hospital; and that after receiving emergency care for a gunshot wound in his hand, which shot off most of his thumb, the police took him to a second hospital, where they brought a man to him and asked if he recognized him and he stated, "I didn't even look up. I was paining too much."

At the hearing on the defendant's motion to suppress the identification testimony, detective Bernard Stahl testified that while proceeding to 45th and Wentworth in answer to a call that a man had been shot, he and his partner received another call that a woman had been shot at 45th and Wells Street. They answered that call first and met Mrs. River Lee Bully, whose cousin had been shot.

Mrs. Bully testified that she left her aunt's house, to return to her own house about 12:30 A.M. on June 23, 1967, when she saw the defendant with a sawed-off shotgun, and Clyde Gunn, with a pistol. She knew the defendant since she had seen him in the neighborhood more than 100 times, and she identified him in court. She described the defendant's gold undershirt, stated that the defendant and Gunn beat her and attempted to shoot her. She further stated that after they left, she flagged down

two policemen, got in their car, and rode around with them until she saw the defendant in a parked Chevrolet; that she exclaimed, "There he is!"; that the defendant jumped out of the car and ran, but was brought back moments later by the police; and that she accompanied her cousin, the woman who had been shot at 45th and Wells Street, to the hospital, and then went to the police station where she identified the defendant.

The defendant testified in his own behalf, and presented an alibi defense, claiming that he was playing cards at the time of the murder. Two witnesses testified in his behalf.

At the conclusion of the trial, the judge stated that when he ruled on the defendant's motion to suppress the identification testimony, he had expressed a willingness to reconsider his adverse ruling thereon, but after hearing the evidence he saw no reason to disturb that ruling; and he found the defendant guilty of murder.

Relying upon *Stovall v. Denno (1967), 388 U.S. 293, 18 L.Ed.2d 1199, 87 S.Ct. 1967, Palmer v. Peyton (4th cir. 1966), 359 F.2d 199,* and *Foster v. California (1969), 394 U.S. 440, 22 L.Ed.2d 402, 89 S.Ct. 1127,* the defendant contends that his preindictment identification in one-man "show-ups" was so unnecessarily suggestive and conducive to misidentification as to deny him due process of law.

In *People v. Blumenshine (1969), 42 Ill.2d 508, 512,* we recognized that "A showing by police of a suspect standing alone, in what is often described as a 'show-up,' has been observed to carry with it a dangerous degree of improper suggestion." We vacated the defendant's conviction and remanded, because the record there failed to indicate that each witness's identification had an origin independent of the improperly suggestive confrontation at the police station.

However, we further observed in *Blumenshine,* at page 512: "Of course, not every viewing of a suspect or suspects

alone will be considered a denial of due process, for there may be justifying or saving circumstances. See, *e.g.,* identifications upheld in: (1) *Stovall v. Denno, 388 U.S. 293, 18 L.Ed.2d 1199,* where the viewing in a hospital was 'imperative,' it being uncertain that the wounded victim would survive; (2) *People v. Speck, 41 Ill.2d 177, 193,* where a principal factor was that it was apparent that the identifying witness had an excellent opportunity to observe the defendant at the time of the crimes; (3) *People v. Robinson, ante,* at 371, where the person identified was known to the witness prior to the crime; (4) *People v. Bey, ante,* at 139, where uncommon distinguishing characteristics were the principal means of identification."

It is plainly evident that the in-court identifications of the defendant made by the three eyewitnesses had origins independent of the confrontations at the hospital and police station. One of them had seen the defendant on various occasions, and they all had ample opportunity to observe him in close proximity under conditions of ample street illumination. The testimony of Mrs. Bully, who was assaulted by the defendant and Gunn shortly after the shooting of Butler, certainly corroborates the testimony of the three eyewitnesses. Their descriptions of the defendant, his clothing, and the weapon used, were all consistent and detailed.

Under these circumstances, the record discloses that the in-court identification of the defendant by the witnesses had a source independent of and untainted by any viewing of the defendant alone at the hospital or police station. *(People v. Fox (1971), 48 Ill.2d 239, 245-246; People v. Gersbacher (1970), 44 Ill.2d 321, 323-325.)* Additionally, the defendant has failed to show that any procedures employed were so conducive to irreparable mistaken identification as to deprive the defendant of due process of law. *(People v. Dennis (1970), 47 Ill.2d 120, 128.)* Accordingly, the judgment of the circuit court of Cook County is affirmed.

*Judgment affirmed.*