THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ARTHUR LEE HUFFMAN, Defendant-Appellant.

First District (4th Division)  No. 77-890

Opinion filed February 28, 1980.

Leo I. Fox, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Linda Dale Woloshin, and Thomas Bucaro, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE ROMITI delivered the opinion of the court:

Defendant Arthur Lee Huffman was convicted of rape and aggravated kidnapping in a jury trial and was sentenced to concurrent terms of 10 to 20 years. On appeal he contends: (1) he was not proven guilty beyond a reasonable doubt; (2) the State's failure to provide material evidence concerning a photographic identification of the defendant constituted a denial of due process; (3) identification testimony at trial should have been suppressed as the product of an illegal seizure of photographs from defendant's home; (4) testimony concerning a lineup identification of the defendant should have been excluded because the lineup was impermissibly suggestive and defendant was not afforded counsel at that lineup; (5) the in-court identification of the defendant should have been excluded as the product of prior unduly suggestive identification procedures.

We affirm.

Before trial defendant moved to suppress any trial testimony concerning a lineup identification as well as any in-court identification of him. This was based on the allegation that the police had suggested to the identifying witness that defendant had committed the crime. Defendant also generally alleged that the identification was made in violation of his constitutional rights under the sixth and fourteenth amendments.

At the hearing on the motion to suppress defendant's sister testified that on May 10, 1974, the police came to her home and obtained two photographs of the defendant. One picture, depicting defendant standing

with four friends, two of whom were wearing hats, was taken by the police from a photo album. The other, depicting the defendant standing alone in front of a building, wearing a "sick" T-shirt, was given to the police by defendant's sister in an effort to persuade them they were taking the wrong brother from the home.

The complaining witness, Georgia C., also testified at the hearing. On April 22, 1974, the police showed her three or four books of photographs but she was unable to identify anyone. On May 12, 1974, two police officers whose names she could not recall came to her home and showed her three to 10 photographs. She viewed them twice and selected one. On May 15, 1977, she viewed a lineup, identified the defendant, and then signed a complaint against him.

It was stipulated that certain police officers[1], if called at the hearing, would testify that they had no recollection of having shown the complainant a stack of photographs at any time prior to her identification of the defendant in a lineup. In argument on the motion defense counsel contended that the lineup identification was tainted because it could be inferred that the police had included the two photographs taken from defendant's home in the small group of photographs shown to the complainant, thus suggesting to her that defendant was her attacker. The trial court held there was insufficient evidence to support this claim and denied the motion.

After the jury had been selected and prior to opening arguments defense counsel moved to dismiss and quash the indictment because of the failure of the State to produce the photographs shown to the complainant on May 12, 1974, as well as the officers who showed them to her. In argument the State informed the court that their efforts to locate the photographs or the officers had been unsuccessful. This motion was also denied.

At trial Georgia testified that on April 13, 1974, at about 8:15 p.m. she took a bus from her home to go to her boyfriend's apartment at 8150 Dobson in Chicago. They had planned to attend a party together and she called him before leaving to tell him she was coming. She left the bus at about 9 p.m. at 79th and Ellis and walked one block east to Dobson. It was dark but the street lights were on. At 80th and Dobson she saw a young black man across the street. As she continued south she noticed he had crossed the street and was walking behind her. He then passed her and turned to look at her. There was lighting from the street lights and from a light on the side of a building which shined onto the street. She described the man as six feet tall, 150 to 160 pounds, age 22 to 24, with a medium brown complexion, a medium Afro, a moustache, hair under his

---

[1] Apparently all those listed by the State as witnesses and the officers involved in obtaining the photographs from defendant's home were included in this stipulation.

chin, wearing dark pants and a plaid jacket. She identified the defendant in court as the man she had seen. He continued to walk about five feet ahead of her until she reached her boyfriend's apartment building. That building's entrance had an outside door leading to a vestibule and a second door inside the vestibule which led to the apartments. At the outside door Georgia noticed that defendant had stopped and turned around to look at her. She entered the vestibule and found the inner door to be locked. She then heard footsteps behind her and a man, whom she subsequently determined to be the same one who had followed her, grabbed her and held a sharp object to her head. She could not see the object but believed it could have been an icepick or a knife. The man demanded her money, threatening to kill her if she made a sound. She complied and he told her he would release her outside. He led her outside with his arm around her neck and the object held to her head. He then told her he would have to take her further to make sure he got away. Georgia was taken to the top of a small slope and across some railroad tracks. There was a street light about five feet away and when they stopped she was able to observe the defendant's face for two to three minutes as he looked around. They crossed back over the tracks and when defendant bent down to place something in his sock Georgia fled, screaming for help. She stumbled and fell and defendant caught up with her, telling her she had made him mad. He led her to a small three-sided shed with a mattress inside. The shed was waist-high and there was a street light about 15 to 20 feet away, enabling Georgia to see the defendant's face as he stood in front of her. He ordered her to remove her clothing, slapping her when she begged him to release her. She then took down her pants and panties so that one leg was out. Defendant unsuccessfully attempted an act of intercourse with her in a sitting position, successfully had intercourse with her in a prone position, and finally unsuccessfully attempted intercourse in a standing position. At several times during these acts Georgia was again able to view the defendant.

Afterward defendant told her she could go. She put on her pants and ran until she came to the end of a viaduct from which she jumped about 13 feet to the sidewalk. This hurt her back and she could not get up but she saw several people in the area and screamed for help. Several men took her to her boyfriend's building. She gave one of them his telephone number so he could be called to open the door. Her boyfriend came down and carried her up to his apartment. As he took her upstairs she told him she had been raped. Georgia was taken to a hospital where a doctor examined her. She spoke to two police officers, telling them what had happened and giving a description of her assailant. On May 15 she viewed a lineup and identified the defendant.

On cross-examination Georgia stated that at the preliminary hearing she testified that at the hospital she had stitches in her vagina. At trial she said she did not know whether the doctor found any lacerations in her vaginal area, but she did recall that it was "torn." She also stated that as a result of her jump from the viaduct she had a lot of tenderness in her back and her left foot was scratched.

Georgia's boyfriend testified that he first saw her that evening downstairs from his apartment at about 10 p.m. Two men were holding her up, her hair was messed up, and she was shaking all over and crying. In her hands she had her purse and her underwear. As he carried her upstairs she told him she had been raped.

The doctor who examined Georgia that night testified that he found sperm to be present. Georgia also had an abrasion on her left foot and minimal tenderness of the lumbosacral spine area. He found no vaginal lacerations and his records indicated that no surgical sutures had been made.

Investigator Jerry Springer of the Chicago Police Department conducted the lineup viewed by Georgia. It contained five young black males including the defendant. Defendant may have been the tallest and may have been the only one wearing a suit, but all were dressed differently. None had goatees; defendant and two others had Afro hairstyles. Three wore glasses, but not the defendant. Defendant told the officer that he was 5 feet, 11 inches tall, weighed 155 pounds, and was 22 years old.

The defense presented the testimony of two police officers who interviewed Georgia after the alleged rape. On April 14, 1974, at the hospital she told Officer Ronald Rewers that no weapon was used, but that the means of attack was a threat. She described her assailant as black, aged 20 to 24, 6 feet to 6 feet, two inches, weighing 150 to 160 pounds, with a moustache and goatee, and wearing a red and green checkered jacket.

Investigator Donald Bullington interviewed Georgia on April 22, 1974, and turned over his notes to two other officers who prepared a report. Bullington testified that he found the report contained "basically what was told" to him. In the report there was no mention of the attempted act of intercourse in a sitting position which Georgia testified preceded the other acts.

Defendant's sister testified that defendant was with her on the night in question from 6:30 p.m. until 4 a.m., first at a birthday party and then at a lounge.

## I.

Defendant contends that the complainant's testimony was so

inconsistent and contradictory as to require reversal for failure of the State to prove its case beyond a reasonable doubt. This contention does not withstand close scrutiny.

Defendant asserts that the complainant related widely disparate descriptions of her assilant. Yet the only inconsistency noted is that although she recalled having described the man's jacket as a red, green, and black plaid, the transcript of her preliminary hearing testimony apparently indicated that she said it was black and one officer recalled her describing it as red and green checked. Georgia recalled having said plaid at that hearing and certainly the jury as trier of fact could have concluded that the one word was mistaken for the other by the court reporter. And the difference between the color descriptions is minor in the light of the additional detailed physical description given by the complainant shortly after the incident, a description which in fact closely approximated the age, weight and height information given by the defendant to the police upon his arrest.

Georgia also testified at trial that a sharp object, perhaps a knife or an ice pick, was held against her during part of the attack. She was unable to see the object at any time. Defendant notes that a police report prepared by an officer who interviewed Georgia at the hospital the night of the attack indicated that no weapon was used and the means of attack was a threat. This response, if made by the complainant, could well have reflected confusion as to whether a threat with a weapon constituted use of a weapon. Furthermore, Georgia testified that she did tell the police of the sharp object that was used, so that at most this discrepancy presented a question of credibility for the jury.

A similar question of credibility was presented by Georgia's testimony that she told the police of the three separate acts of intercourse attempted by her assailant. A report prepared by the police from the notes of an officer who interviewed Georgia several days after the incident did not include one of the attempted acts, though it did indicate that she told of the completed act. If this detail was in fact omitted by her in that interview it was for the jury to determine its significance in the light of her prompt report of the fact of the rape and her consistent testimony at trial about the details of that attack.

Finally, defendant notes that in her preliminary-hearing testimony Georgia said she had received vaginal stitches at the hospital after the incident but at trial the examining doctor's records did not reflect this. At trial Georgia indicated uncertainty about the nature of her injury, testifying that she did not know if any lacerations were found but that the area was "torn." Of course, the question of the extent of injuries resulting from the rape was incidental to the central contention of the complainant that she had been raped, a charge which she consistently made from the

time of her immediate outcry after the attack through her testimony at trial.

The other items noted by defendant do not in fact present actual contradictions or inconsistencies. Thus he notes that Georgia testified she first saw her assailant before reaching her boyfriend's house but at the preliminary hearing she said she first *met* him at the apartment building. This would appear only to reflect the distinction between the first sight of the defendant on the street and the first physical confrontation, or meeting, with him. Defendant also suggests that Georgia's account of leaping from the viaduct was unbelievable given the minor injuries she sustained. But she testified that this caused immobilizing pain to her back as well as injury to her foot. The examining doctor's testimony was that despite the minimal tenderness he found in her back the pain she described could have resulted from what she had described. He also found an abrasion on her foot. Again, defendant questions why Georgia had not called her boyfriend after she got off the bus so he would let her in the locked building. In fact she testified that she called him before leaving her home, and he testified that he was expecting her at 9 p.m. Finally defendant challenges Georgia's boyfriend's account of finding her in the vestibule with her underwear in her hand. Defendant notes that Georgia testified that when forced to undress she left one foot in her clothing. But this ignores her subsequent testimony of three attempted acts of intercourse in various positions occurring after this. And Georgia testified only that she put on her pants after this, so that her testimony did not contradict her boyfriend's account.

■ In summary, defendant has cited no inconsistencies so material as to render the jury's determination of credibility contrary to the manifest weight of the evidence. It is not our function on review to substitute our determination of credibility for that of the jury. (*People v. Jones* (1975), 60 Ill. 2d 300, 325 N.E.2d 601; *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631.) And upon review of the totality of the evidence we find that the verdict they reached was amply supported.

## II.

Defendant contends that he was denied due process of law by the failure of the State to produce the pictures shown to the complainant when she identified him and the officers who showed them to her. But this claim is necessarily based on the assumption that this evidence was favorable to the defendant and was in fact suppressed by the State. (*United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392; *Brady v. Maryland* (1963), 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194.) Here defendant concedes that the State made a good faith effort to locate this evidence. All police officers connected with the case were

apparently interviewed but the officers involved could not be located or identified. Moreover, defendant has failed to demonstrate the materiality of his evidence to his defense. He only suggests that he may have been able to establish some suggestiveness in the photographs or in the behavior of the officers showing them. This is pure speculation; defense counsel had the opportunity to question the complainant about the circumstances of her photographic identification but he elicited no details tending to establish such suggestiveness. Indeed, the information elicited, that defendant was identified at that time, was clearly unfavorable to the defendant. Under these circumstances we find no violation of due process arising from the inability of the State to locate this evidence. Defendant has demonstrated neither the reasonable possibility that the evidence would have been favorable nor the fact of suppression by the State.

### III.

■■ Defendant also contends that the identification testimony at trial should have been suppressed as the product of an illegal seizure of two photographs from defendant's home. Defendant never advanced this argument at trial. His pretrial motion to suppress identification testimony was based on the contention that prior identifications had been impermissibly suggestive. As a consequence there is no evidentiary foundation for his claim of an illegal seizure. At the hearing defendant's sister merely testified that the police obtained the photographs from her home. She was not asked whether a warrant was utilized and the officers who obtained the photographs were not called to testify. Thus defendant did not even establish a prima facie showing of an illegal search and seizure such as would have required the State to establish that the seizure was lawful. (See *People v. Berg* (1977), 67 Ill. 65, 364 N.E.2d 880; *People v. Clark* (1977), 55 Ill. App. 3d 379, 370 N.E.2d 1111, *cert. denied* (1978), 439 U.S. 858, 58 L. Ed. 2d 165, 99 S. Ct. 173.) Because defendant never objected to identification testimony on this basis he has waived this contention on appeal. *People v. Pickett* (1976), 35 Ill. App. 3d 909, 342 N.E.2d 766.

Even had defendant established this primary illegality and preserved the question for review, the record also would not support his claim that subsequent identifications were based on the photographs taken from his home. The complainant was not questioned about the photographs from which she selected the defendant. Defendant's sister had described in some detail the photographs that were taken. At trial the complainant was able to testify that a photograph of the defendant shown to her by defense counsel was not one of those in the group from which she identified the defendant. But no attempt was made at the hearing to ascertain whether the photographs described by defendant's sister were

among that group. Thus, even were we to consider defendant's claim on the merits and also find an illegal seizure there would be no evidentiary basis for concluding that subsequent identifications were the product of that seizure.

## IV.

■ Defendant attacks his lineup identification on two distinct grounds. He contends that the lineup procedure itself was impermissibly suggestive and that defendant was not afforded counsel at the lineup. Testimony established that the lineup consisted of five young black males. All were dressed differently. None had goatees and three, including the defendant, had Afro hairstyles. Three wore glasses and two, including the defendant, did not. Defendant may have been the tallest in the lineup although apparently there was no great discrepancy, for the officer who testified to this did not express certainty on the point. But in any event there is no requirement that all the members of a lineup be physically identical and where differences in age, size or appearance are not of a gross nature such differences as do exist do not affect the admissibility of the procedure; they only affect the weight to be accorded that identification by the trier of fact. *People v. Harrison* (1978), 57 Ill. App. 3d 9, 372 N.E.2d 915; *People v. Owens* (1977), 46 Ill. App. 3d 978, 361 N.E.2d 644.

■ Defendant's claim of a violation of his right to counsel is totally without merit. The record establishes that it was only after the lineup that the complainant signed a complaint against the defendant. Ultimately he was indicted for the offenses at issue several months after that lineup. Defendant had no right to the presence of counsel at the lineup which preceded the institution of formal charges against him. *Kirby v. Illinois* (1972), 406 U.S. 682, 32 L. Ed. 2d 411, 92 S. Ct. 1877; *People v. Burbank* (1972), 53 Ill. 2d 261, 291 N.E.2d 161, *cert. denied* (1973), 412 U.S. 951, 37 L. Ed. 2d 1004, 93 S. Ct. 3017.

## V.

■■ Defendant's final contention, that his in-court identification should have been suppressed as the product of prior suggestive identification procedures, has been answered by our rejection of his direct attacks on those prior procedures. (See *Manson v. Brathwaite* (1977), 432 U.S. 98, 53 L. Ed. 2d 140, 97 S. Ct. 2243; *People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) But even had we found some undue suggestiveness in a prior identification, it is well established that a subsequent in-court identification would be permissible if that identification was adequately grounded in an independent opportunity the witness had to observe the defendant. (*People v. Taylor* (1972), 52 Ill. 2d 293, 287 N.E.2d 673; *People*

*v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239.) In this cause defendant concedes that the complainant had an ample opportunity to observe her assailant at the time of the attack; he also concedes the detailed description she gave shortly after that attack closely matched the defendant. Under these circumstances we find that the in-court identification of the defendant made by the witness was founded on adequate independent bases and was properly admitted.

For the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

LINN, P. J., and JOHNSON, J., concur.