THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CORTEZ WILLIAMS, Defendant-Appellant.

First District (3rd Division)    No. 79-1616

Opinion filed April 29, 1981.

Robert H. Aronson, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joel A. Stein, and Alphonse R. Tomaso, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE WHITE delivered the opinion of the court:

Following a bench trial, defendant, Cortez Williams, was found not guilty of one count of attempt murder and guilty of four counts of aggravated battery. Judgment was vacated on three of the counts of aggravated battery and defendant was sentenced to serve two years in the Illinois State Penitentiary on the remaining count. On appeal, defendant contends:

1. that the State failed to prove defendant guilty beyond a reasonable doubt;

2. that the State did not establish beyond a reasonable doubt that defendant was not acting in defense of dwelling;

3. that the shotgun was improperly admitted into evidence because it was not sufficiently connected with the defendant and the crime;

4. that the shotgun was improperly admitted into evidence because it was seized as a result of a prior illegal search;

5. that defendant's statement that he possessed a shotgun and the shotgun itself were improperly admitted into evidence because the requirements of *Miranda* were not satisfied;

6. that the shotgun was improperly admitted into evidence because defendant's consent to seize the weapon was coerced.

The events in question occurred on October 10, 1977, in and around a two-building complex located on the northwest corner of Roosevelt Road and Keeler Avenue in Chicago. Defendant owned the building complex which contained apartments and various businesses, including Mary's Chicken restaurant also owned by defendant. A fence separated this building from an alley to the north, and there was also a fence on the Keeler Avenue side of the building. A gate that exited into the alley was kept locked at all times by a chain and padlock, as was the gate on the Keeler Avenue side of the building.

Leonard Spencer, the victim, testified that on October 10, 1977, he was 15 years old. At some time after 9 p.m. on that date, he and his brother, Floyd Spencer, left a pool hall also located at Roosevelt and Keeler, to look for some girls who had left the pool hall about five minutes earlier. Leonard identified these girls as Debra, Denise and Karen. In order to catch up with them, Floyd and Leonard were walking through an alley behind Roosevelt and Keeler when Leonard heard some noise. He looked back and saw defendant, whom he knew by the name of "Rudy," standing inside a fence pointing a shotgun at his brother. He snatched his brother and threw him over against a wall. He was then shot in the face. After he was shot he fell over some car seats. He saw defendant coming toward him, and he remembered begging defendant, "[P]lease don't shoot me no more" before he "blanked out."

Leonard testified that at the time of the shooting the sun was almost down but it was light with alley lights and city lights. In court he identified defendant as the person who did the shooting.

Floyd Spencer substantially corroborated his brother's testimony as to their movements and the shooting. Floyd testified that his brother grabbed him by the shoulders and threw him down, that he looked at his brother and heard a "boom," and that his brother fell down and told him that he had been shot. According to Floyd, he then "looked around" and saw defendant, whom he knew, holding something long in his hand. Floyd then ran to the house of one of his mother's friends and called the police. Floyd testified that his brother was outside the fence when he ran away.

After the police arrived, Floyd went back to the location where the incident took place, but his brother was no longer there. Floyd testified that his brother was now inside the fence. Floyd also testified that he told police officers at the scene that Rudy shot his brother and that he pointed defendant out to the police at that time, but that the police officers told him to "shut up." In addition, Floyd stated that he never spoke to the police about the shooting again until January 1978.

On cross-examination, Floyd also testified that it was dark outside but that there were lights, and that he did not see any ladders or tools around the fence. Furthermore, Floyd testified that he might have told police at the scene that he didn't know who shot his brother, but if he did know, he would kill him.

Walter Williams testified that he was driving his car in the vicinity of Roosevelt and Keeler at 9:30 p.m. on October 10, 1977, when a young man, whom he now knows as Floyd, ran out of the alley by Keeler and told him that his brother had been shot in the alley. According to Williams, two police officers arrived about this time, and he directed the police toward the scene of the occurrence, where he observed Floyd's brother lying flat on his back on the ground at the back of the building by a stairway, inside the fence. The gate was locked.

Williams then testified that he went inside a "kitchen store" and asked defendant if he had any keys to unlock the gate, and defendant responded that he did not. Williams went back outside, but returned and asked defendant again to unlock the gate. Defendant responded, "[L]et the son of a bitch die." Williams also testified that defendant finally did unlock the gate, and that during all this time, Floyd was running around the alley yelling, "[H]elp my brother, help my brother." Further, Williams stated that Floyd kept pointing at defendant saying, "That man shot my brother," and that the police told Floyd to shut up or they would arrest him. Williams also stated that he did not see any ladders or tools around the area in question.

The last witness for the State was youth officer Donald Barany, who testified that he first saw Leonard Spencer on January 22, 1978, when Leonard was under arrest and brought before him for "processing and disposition." Barany noticed that Leonard's eye "was fairly shattered" and that Leonard had "a big scar on his neck." Leonard told Barany how these injuries were received. On January 25, Barany spoke to both Leonard and Floyd at Area Four (a police station). At this time, both youths stated that Cortez Williams was the person who shot Leonard.

According to Barany, he and his partner then went to "a chicken shack place" located at Keeler and Roosevelt. They spoke to a female employee at the chicken shack, and the employee told them that she expected defendant to be back shortly. Barany told this woman to have defendant come to Area Four, because there was a problem that had to be resolved.

Barany then testified that he and his partner returned to Area Four and that defendant came approximately 40 minutes later. The following is Barany's testimony as to what occurred at this time:

"A. At the time we saw Mr. [Cortez] Williams he came into area

four on the second floor youth division and my partner and I subsequently informed him of his rights.

* * *

A. Well, we advised him that he had the right to remain silent. He had the right to an attorney. And that anything he may say could be held against him.

Q. And did you advise him also that an attorney would be provided for him?

A. Yes, sir.

* * *

Q. And did you have occasion to speak to Mr. Williams any time during that day?

A. Yes, I did because I saw Mr. Williams in the room, the homicide section investigators had finished briefly interviewing him and I went into the room and talked to him.

* * *

A. Well, I told him that I was in here for the purpose of recovering the weapon, the shotgun.

Q. Was your partner with you at the time?

A. No, sir.

Q. And what if anything did Mr. Williams say to you regarding the shotgun?

A. At first he responded that he didn't own a shotgun.

Q. What if anything did you say to him?

A. *I said that I know for a fact that he has one behind the counter in the chicken shack.*

* * *

A. *Well, then Mr. Williams did admit that he had a shotgun there.*

* * *

A. And I said that I wanted his permission to go into the chicken shack to retrieve the shotgun and bring it in as evidence.

Q. And did he in fact give you permission at that time?

A. *Not immediately. I informed him that otherwise I would have to get a warrant.*

Q. After informing him of that fact what happened, Officer Barany?

A. *Then he gave me permission to go over there to the chicken shack at Roosevelt and Keeler and to obtain the weapon."* (Emphasis added.)

After this conversation, Barany and his partner went to the chicken shack. Barany informed the female employee, whom he had spoken to before, that defendant had given them permission. Barany then retrieved a shotgun from inside an office at the end of a counter.

Defendant testified that he never shot anybody with a shotgun on the night in question and that he never owned a shotgun. Defendant stated that he was in the serving area of Mary's Chicken Shack at approximately 9:30 p.m. on October 10, 1977, when he heard a noise that sounded like a backfire. A few minutes later, according to defendant, he received a telephone call from Bill Blackburn, one of his tenants on the third floor, who informed him that someone had been shot. Defendant then went to the back door and looked out through a peephole, but he didn't see anything because it was dark. Then defendant phoned the police and told them someone had been shot.

According to defendant, when the police arrived, he couldn't find the key for the Keeler gate, so let the officers go through the restaurant. Defendant went outside with the officers, and they found the victim near a stairway in the back gangway to the west of the north building. Defendant stated that he also noticed a hammer, a screwdriver, and some pliers in the back gangway approximately two feet from the victim's body. In addition, defendant noticed that there was a 30-foot ladder in the middle gangway, located between the two buildings, leaning vertically against one the buildings reaching up to a second floor apartment, and that there was blood by the ladder. Defendant also testified that he opened the gate in the back, and that the police put the victim on a stretcher and placed him in a paddy wagon.

Defendant also explained how he came into possession of the shotgun recovered by Officer Barany. He testified that he received the shotgun on January 24, 1978, and was holding it as security for a $35 loan that he had made to an electrician. He stated that he never fired this shotgun, that he never had a shotgun before, and that this shotgun was kept in a "broke down" nonoperational condition in a plastic bag in his office "between" his desk. The shotgun was in this condition when Officer Barany and his partner went to defendant's office.

Three witnesses corroborated parts of defendant's explanation of the events that took place on the night in question. Police officer Traverse Pumphrey testified that he and his partner entered the alley and went to the rear of the apartment building and that he was in the first police vehicle to arrive at the scene. When he got out of his vehicle, he saw Leonard Spencer lying on his back "in the rear of the second stairwell" inside the fence. Pumphrey testified further that some policemen gained admittance to the fenced area by going through a business. A person who might have been defendant came with these policemen and unlocked the gate allowing Pumphrey and his partner to enter.

Pumphrey also testified that an attempt was made to question Leonard Spencer at the scene. At this time, another man, who claimed to be the victim's brother, ran up and said, "He shot him," but the brother

would not tell the police who did the shooting. Pumphrey testified that Leonard Spencer was asked, "Who shot you?" Leonard responded, "I don't know the man. I was shot. I'm hurt. Get me to the hospital." Pumphrey stated that he had a conversation with Leonard's brother at the rear of the building, that Leonard's brother was "ranting and raging" and "acted like he was out of his mind," and that the brother said that he did not know who shot Leonard.

Pumphrey also entered the east-west gangway between the two buildings. He noted that everything was locked up securely, that all the store fronts were intact, that there was a "burned out" apartment on the second floor with no windows, that there was a ladder lying down on its side against the building, *i.e.*, it was lying in a horizontal position and not in a vertical position leading up to the second story, and that there was blood in two areas, where the ladder was and where the man was lying. Pumphrey also testified that Leonard was dispatched to Loretto Hospital and that he spoke to him there. At that time, Leonard stated that he did not know who shot him.

On cross-examination, Pumphrey was questioned regarding a one page report signed by both Pumphrey and his partner. Neither Floyd Spencer's name nor Walter Williams' name appeared in the report. This report also stated that Leonard was unconscious when he was transported to Loretto Hospital and that Pumphrey and his partner were unable to interview Leonard at that time.

William Blackburn testified that he lived in a third-floor apartment on the corner of Keeler and Roosevelt, that defendant was his landlord, and that he was married to Mavis, who was employed by defendant at Mary's Chicken restaurant. While in his apartment on the night in question, he heard a shot. He went out on his porch and looked down on the gangway between the two buildings where he saw a kid "laying there by a ladder." According to William, he then called defendant on the telephone and told him to call the police because somebody had been shot. William also testified that the ladder was in a vertical position leaning against the adjoining building, that the ladder would reach to the second story, and that the ladder remained in the same vertical position for "a couple more days."

Mavis Blackburn, William Blackburn's wife, testified that she was employed by Mary's Chicken restaurant. On the night in question at approximately 9:30 p.m., she was working in the restaurant when she heard "something like a backfire." After this sound, defendant, who was in his office according to Mavis, received a telephone call from her husband. Mavis also testified that on that night after she finished work, she saw a ladder in the gangway area leading up to an apartment, that she

didn't believe anybody lived in the apartment the ladder led up to, and that the ladder remained there for three or four days.

I

██ Defendant's first argument is that he was not proved guilty beyond a reasonable doubt. We disagree.

Defendant was identified by both the victim and the victim's brother as the person who shot the victim. This identification was strengthened by the fact that each had known defendant prior to the incident and by Walter Williams' testimony that Floyd Spencer pointed out defendant at the scene as the person who did the shooting.

Officer Pumphrey testified for the defense that both Floyd and Leonard at the scene said that they did not know the assailant. The trial court could well have disbelieved this testimony given the fact that the police report Pumphrey signed said Leonard could not be interviewed at the scene.

In a bench trial, the court is the trier of fact. (*People v. Horobecki* (1977), 48 Ill. App. 3d 598, 602, 363 N.E.2d 1, 4.) "[I]t is the function of the trier of fact to determine the credibility of the witnesses, the weight to be given to their testimony and the inferences to be drawn from the evidence." (*People v. Akis* (1976), 63 Ill. 2d 296, 298, 347 N.E.2d 733, 734.) The judgment of the trial court in a bench trial should not be set aside "unless the proof is so unsatisfactory as to cause a reasonable doubt of guilt to appear." (*People v. Lofton* (1977), 69 Ill. 2d 67, 73, 370 N.E.2d 517, 519.) A reviewing court should not "substitute its judgment as to the weight of disputed evidence of the credibility of witnesses for that of the trier of fact who heard the evidence presented and observed the demeanor of the witnesses," unless the evidence is so improbable as to raise a reasonable doubt of guilt. *People v. Novotny* (1968), 41 Ill. 2d 401, 412, 244 N.E.2d 182, 188.

██ █ Defendant, who took the stand, denied the shooting and said he was in the serving area of his restaurant when it occurred. The law is clear that " ' "where the identification of the accused is at issue, the testimony of one witness is sufficient to convict, even though such testimony is contradicted by the accused, provided the witness is credible and he viewed the accused under such circumstances as would permit a positive identification to be made." ' " (*People v. Yarbrough* (1977), 67 Ill. 2d 222, 226, 367 N.E.2d 666, 668; *People v. Stringer* (1972), 52 Ill. 2d 564, 569, 289 N.E.2d 631, 634.) In addition, the testimony of an identification witness is strengthened to the extent of his prior acquaintance, if any, with the accused. (*People v. Horobecki* (1977), 48 Ill. App. 3d 598, 602, 363 N.E.2d 1, 3; *People v. Lumpkin* (1975), 28 Ill. App. 3d 710, 329 N.E.2d 262.) In the

light of these authorities we conclude that there was sufficient credible evidence to prove defendant's guilt beyond a reasonable doubt.

## II

Although defendant testified that he did not shoot Leonard Spencer, he also asserts an alternative theory of defense. Defendant contends that if he did shoot Leonard Spencer, such act was justifiable battery, to prevent the commision of burglary in a dwelling. Section 7—2 of the Criminal Code of 1961 provides:

> "§7—2. Use of Force in Defense of Dwelling. A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to prevent or terminate such other's unlawful entry into or attack upon a dwelling. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if:
> * * *
>
> (b) He reasonably believes that such force is necessary to prevent the commission of a felony in the dwelling." Ill. Rev. Stat. 1979, ch. 38, par. 7—2.

■■ Illinois law permits a defendant to assert inconsistent defenses. (*People v. Woods* (1971), 131 Ill. App. 2d 54, 268 N.E.2d 246; *People v. Smith* (1970), 121 Ill. App. 2d 105, 257 N.E.2d 261.) However, the ability of a defendant to assert inconsistent defenses is limited. In *People v. Lahori* (1973), 13 Ill. App. 3d 572, 300 N.E.2d 761, a defendant testified that he could not remember whether or not he shot the deceased because he had blacked out, but asserted that if he did shoot the deceased, he was acting in self-defense. The court held that the trial court did not err in refusing the defendant's tendered self-defense instruction. The court stated:

> "Raising the issue of self-defense requires as its sine qua non that defendant had admitted the killing as the basis for a reasonable belief that the exertion of such force was necessary." 13 Ill. App. 3d 572, 577, 300 N.E.2d 761, 764-65.

On the basis of the authority and reasoning of *Lahori* the State argues that defendant's claim of defense of dwelling is fatally inconsistent with the fact that defendant denied shooting Leonard Spencer, because admission of the shooting is the *sine qua non* of the defense of dwelling. We need not resolve this argument because we are of the opinion that the evidence presented by both the State and the defendant was insufficient to raise the affirmative defense of defense of dwelling.

■■ In *People v. Jackson* (1975), 35 Ill. App. 3d 215, 340 N.E.2d 673, this court recognized that an affirmative defense can also be raised by the State's evidence. Defense of dwelling is an affirmative defense which

must be raised by the pleadings or the evidence. (*People v. Williams* (1974), 57 Ill. 2d 239, 311 N.E.2d 681, *cert. denied* (1974), 419 U.S. 1026, 42 L. Ed. 2d 302, 95 S. Ct. 506; Ill. Rev. Stat. 1979, ch. 38, par. 7—14.) To raise the issue of defense of dwelling, the defendant must present some evidence thereon, unless the State's evidence raises the issue. (*People v. Sedlacko* (1978), 65 Ill. App. 3d 659, 382 N.E.2d 363; Ill. Rev. Stat. 1979, ch. 38, par. 3—2.) Defendant points to the testimony that Leonard Spencer was inside the fence, that there was a ladder against the building, that there was blood by the ladder, and that defendant saw tools near Leonard's body. Although this testimony might be consistent with the commission of a burglary, we note that the trial court stated: "[T]here was [*sic*] no broken windows or windows jimmied or nothing physically in evidence that any of the witnesses testified to indicate to the court that a burglary was about to take place." We also note that there is absolutely no evidence in the record, presented by either the State or defendant, to indicate that defendant reasonably believed that the force used was necessary to prevent the commission of a felony in a dwelling as required by section 7—2(6) of the Criminal Code of 1961 (Ill. Rev. Stat. 1979, ch. 38, par. 7—2(b)). We conclude, therefore, that neither the evidence offered by the State nor the evidence presented by defendant raised the issue of defense of dwelling.

### III

Defendant's third argument is that a shotgun was improperly admitted into evidence because it was not sufficiently connected with the defendant and the crime. The State maintains that the testimony of Leonard Spencer that the shotgun admitted into evidence was similar to the weapon with which defendant shot him and the fact that the weapon was recovered from defendant's possession were sufficient to connect the shotgun with the defendant and the crime, thereby rendering the weapon admissible into evidence.

■■ A weapon may be admitted in evidence where there is proof connecting it with the defendant and the crime, and it is not necessary to establish that the particular weapon was the one which was actually used. (*People v. Ashley* (1960), 18 Ill. 2d 272, 280, 164 N.E.2d 70, 74, *cert. denied* (1960), 363 U.S. 815, 4 L. Ed. 2d 1157, 80 S. Ct. 1255.) If it is shown that defendant, when arrested, possessed a weapon which could have been used in the commission of the crime charged, it may be admitted in evidence. *People v. Magby* (1967), 37 Ill. 2d 197, 202, 226 N.E.2d 33, 36.

In *People v. Johnson* (1966), 35 Ill. 2d 516, 518, 221 N.E.2d 497, 498, the court stated:

"[W]here there is evidence indicating that an accused possessed a weapon at the time of the offense, a similar weapon found in his

possession at the time of his arrest may be admitted against him, even though not identified as the actual weapon used by the accused in committing the crime."

In that case, the court held that the admission of a revolver into evidence was not error where two witnesses testified that a hand gun or revolver was employed in the commission of the offense, where there was testimony indicating that the defendant participated in the crime, and where the evidence established that the defendant possessed a revolver at the time of his arrest. (35 Ill. 2d 516, 519, 221 N.E.2d 497, 499.) Similarly, a gun was found to be sufficiently connected with the defendants and the crime where the "complaining witness testified that the gun offered in evidence looked like the 'silvery object' which one of the robbers pointed at him and one of the arresting officers identified the gun as the one he picked up at the time defendants were arrested." *People v. Pittman* (1963), 28 Ill. 2d 100, 103, 190 N.E.2d 802, 803.

■■ A recent appellate court decision reinforces this line of cases. In *People v. McClinton* (1978), 59 Ill. App. 3d 168, 375 N.E.2d 1342, the court held that a *rifle* was connected to both the crime and the defendants where a rifle was found in the possession of a co-defendant at the time of his arrest, and two witnesses testified that a *shotgun* was used in the commission of the offense. The court noted that the rifle was suitable for the crime charged, that the rifle was similar to a shotgun, that there was evidence that defendants participated in the crime, and that it was unnecessary to show that the weapon was the one which was actually used in the particular crime. 59 Ill. App. 3d 168, 175-76, 375 N.E.2d 1342, 1349.

■■ On the basis of the authorities cited above, we conclude that the trial court did not err in admitting the shotgun into evidence. The victim, Leonard Spencer, testified that the shotgun admitted into evidence looked like the weapon he saw in the alley on the night in question. Leonard also testified that he observed the defendant with a shotgun at that time, and Leonard's injury was obviously caused by a shotgun. Furthermore, defendant admitted that he had a shotgun in the chicken shack, and the officers retrieved the shotgun from defendant's business. Therefore, there was sufficient proof to connect the shotgun to the defendant and the crime.

■■ Defendant also contends that the shotgun was not "sufficiently connected" because there was no proof that the shotgun in evidence was operable. There was some evidence on this point. Leonard Spencer testified that he was shot by a shotgun that looked like the shotgun admitted into evidence. The shotgun was admissible without further proof that it was operable. This conclusion is supported by the general rule that, "It is not necessary to establish that the weapon was the one which was actually

used in the particular crime." *People v. McClinton* (1978), 59 Ill. App. 3d 168, 175, 375 N.E.2d 1342, 1349.

## IV

Defendant's fourth argument is that the shotgun was improperly admitted into evidence because it was seized as the result of a prior illegal search. To support this argument, defendant relies on the testimony of Officer Barany that (a) he and his partner went to the chicken shack and told a female employee to tell defendant to come to Area Four; (b) defendant came to Area Four shortly thereafter; and (c) Officer Barany, during his questioning of defendant, told defendant, "* * * I know for a fact that he [defendant] has one [a shotgun] behind the counter in the chicken shack." Defendant contends that it should be inferred from Barany's statement that Barany and his partner conducted an illegal search when they were in the restaurant earlier that day.

The State argues that the defendant's failure to object to Barany's testimony, his failure to move to suppress the evidence, and his failure to raise the issue of an allegedly illegal search in his motion for a new trial, waive consideration of the issue on review. Defendant did, however, object to the admission of the shotgun into evidence on the ground that it had not been legally connected with the crime in question, and his "Motion for New Trial and Motion in Arrest of judgment" alleged, "That the court erred in admitting the shotgun into evidence."

"[I]t is generally true that issues not raised in the trial court cannot thereafter be raised on appeal." (*People v. McIntosh* (1977), 53 Ill. App. 3d 958, 959, 369 N.E.2d 217, 218.) Where a defendant fails to object to testimony at trial and does not raise the issue in his motion for a new trial, he waives the issue for review. (*People v. Jones* (1980), 82 Ill. App. 3d 386, 393, 402 N.E.2d 746, 751.) The waiver rule applies to constitutional questions as well as to other issues. (*People v. Pickett* (1973), 54 Ill. 2d 280, 282, 296 N.E.2d 856, 857.) Furthermore, "an objection on a specific ground at trial waives any objection to that evidence on other grounds." *People v. Jones* (1975), 60 Ill. 2d 300, 307, 325 N.E.2d 601, 604.

■■ Belatedly, defendant now in this court raises for the first time the issue that the shotgun was the product of an unconstitutional search. We conclude that this issue has been waived. *People v. Huffman* (1980), 81 Ill. App. 3d 901, 401 N.E.2d 1211; *People v. Miller* (1966), 76 Ill. App. 2d 261, 222 N.E.2d 153; Ill. Rev. Stat. 1979, ch. 38, par. 116—1(c).

Furthermore, in Illinois, "the burden is on the accused in the first instance to prove that the search and seizure was constitutionally impermissible." (*People v. Black* (1972), 52 Ill. 2d 544, 554, 288 N.E.2d 376, 382, *cert. denied* (1973), 411 U.S. 967, 36 L. Ed. 2d 689, 93 S. Ct. 2155.)

Section 114—12 of the Code of Criminal Procedure of 1963 provides that a defendant aggrieved by an unlawful search and seizure may move the court to suppress evidence obtained as the result of an illegal, warrantless search. (Ill. Rev. Stat. 1979, ch. 38, par. 114—12(a).) Such a motion to suppress evidence illegally seized "shall be made before trial unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion." (Ill. Rev. Stat. 1979, ch. 38, par. 114—12(c).) Where the basis for a motion to suppress evidence is an allegedly illegal search, it is incumbent upon the defendant in the first instance to establish that there was a search and that the search was illegal. *People v. Berg* (1977), 67 Ill. 2d 65, 68, 364 N.E.2d 880, 881; Ill. Rev. Stat. 1979, ch. 38, par. 114—12(b).

Although we have authority pursuant to Supreme Court Rule 615(a) to notice plain errors affecting substantial rights which were not brought to the attention of the trial court (Ill. Rev. Stat. 1979, ch. 110A, par. 615(a); *People v. Pickett* (1973), 54 Ill. 2d 180, 296 N.E.2d 856), we decline to apply the plain error doctrine under these circumstances where the only alleged "proof" of an unlawful search and seizure is an inference drawn from a police officer's statement.

## V

Defendant's fifth argument is that the shotgun was improperly admitted into evidence because defendant had not been advised of his rights under *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, before he admitted that he had a shotgun in the chicken shack and before he gave his permission to retrieve the weapon. Although not clear from his brief, we will assume that he now contends that this statement that he had a shotgun and the gun were both inadmissible.

The State contends that defendant waived these issues because he never objected to the statement on the ground of involuntariness either at the time of trial, in a pretrial motion, or in his post-trial motion. Further, defendant never objected to the admission of the shotgun on the basis of a failure to comply with *Miranda*, and his post-trial motion did not specify this failure.

██ The general waiver rules discussed with respect to the fourth issue are also applicable here. Since defendant never made a pretrial motion to suppress either the shotgun or his statement, never objected at trial or in his post-trial motion to Officer Barany's testimony that defendant said that he had a shotgun, and never objected, either at trial or his post-trial motion, to the admission of the shotgun into evidence on the basis that *Miranda* had not been complied with, we conclude that defendant has waived consideration of this issue on review. (*People v. Griffith* (1978), 56 Ill. App. 3d 747, 372 N.E.2d 404; *People v. Reed* (1974), 23 Ill. App. 3d

686, 320 N.E.2d 249.) Furthermore, the record clearly reveals that Officer Barany did advise defendant of his rights under *Miranda* before defendant admitted that he had a shotgun and gave the officer permission to retrieve it. See *People v. Hill* (1968), 39 Ill. 2d 125, 233 N.E.2d 367, *cert. denied* (1968), 392 U.S. 936, 20 L. Ed. 2d 1394, 88 S. Ct. 2305 (once *Miranda's* mandate is complied with at the threshold of the questioning, it is not necessary to repeat the warnings at the beginning of each successive interview).

## VI

Defendant's last argument is that the shotgun was improperly admitted into evidence because defendant's consent to the seizure of the weapon was coerced. Again the argument is being raised for the first time here in this court. Defendant made no pre-trial motion to suppress, and he never objected to the admission of the shotgun into evidence on this basis, either at trial or in his post-trial motion. Therefore, on the authority of the decisions cited above, we conclude that defendant has waived this issue for review.

For the reasons stated above, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

RIZZI, P. J., and McNAMARA, J., concur.