THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DONALD LANASA, Defendant-Appellant.

First District (1st Division)   No. 81—2305

Opinion filed March 31, 1983.

Gordon H. Berry, of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, Bruce A. Cardello, and Larry J. Crown, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CAMPBELL delivered the opinion of the court:

Defendant Donald Lanasa was convicted in a bench trial of home invasion, rape and two counts of deviate sexual assault and was sentenced to four concurrent 30-year terms for the four convictions. On appeal, defendant raises the following issues: (1) whether the evidence established his guilt beyond a reasonable doubt; (2) whether he was denied his right to effective assistance of counsel; and (3) whether the trial court erred in sustaining an objection to testimony by a policy officer and concerning a statement made by the complaining witness.

At trial, the first witness for the State was the victim. She stated that on August 10, 1980, she lived with her 12-year-old daughter at her parents' home in Cicero, Illinois. She testified that at approximately 3 a.m. on that morning, she was awakened by a man who was standing at the foot of her bed. The man told the witness to keep quiet. The victim extended her arm and felt a blade which felt like a steak knife. According to the prosecutrix, light from a neighbor's home illuminated her bedroom. The victim stated that the light was

"like a 500 watt bulb" and that it "lights up everything." The intruder told the victim to turn over and put her face in the pillow. The victim was then instructed to disrobe. The intruder then had sexual intercourse with the prosecutrix. According to the victim, the intruder then performed a deviate sexual act with her. Subsequently, the intruder turned on the light in the bedroom. The victim stated that she had an opportunity to view the intruder's face and, on one occasion, viewed his face for approximately one-half minute, at which time the intruder had wrapped a bath towel around his head. The victim then identified defendant as the man who was in her home on the morning of August 10, 1980.

When defendant saw the victim looking at him, defendant jumped onto her back and placed the knife to her throat. The intruder then asked the prosecutrix whether she had any money. The witness stated that she had about $3 in her purse or jeans. Defendant then left the bedroom and went to the kitchen. According to the victim, defendant returned to the bedroom where he inquired as to whether the victim had a telephone. After ascertaining that there was a telephone, defendant then cut the telephone wire in the dining room. Defendant then stated to the victim that "We're going to do this again; it was fun." He turned off the bedroom light and had a second act of intercourse with the victim. Afterwards, defendant forced the victim at knifepoint to perform a deviate sexual act. The prosecutrix lay on the bed for 10 minutes after she heard defendant leave the home. She stated that she then awakened her parents.

According to the victim, her father telephoned the Cicero police and the officers arrived at approximately 5 a.m. The victim was taken to a hospital where blood and semen samples were taken. She stated that she told the officers that the intruder was white, 5 feet 9 inches tall, 180 pounds, 20 to 25 years old and wore blue jeans, a T-shirt with a white bottom and black top and hard-soled shoes. She also told the officers that the assailant had dark hair, was clean-shaven and had a bandage on his right arm. The witness denied telling the police officers that she could not describe the intruder and also denied that she told the police that she did not look at the intruder. She testified that she was taken from the hospital to the police station and that she did not recognize any of the 50 to 75 photographs which she was shown.

The victim testified that on September 20, 1980, she identified defendant in a lineup at the Berwyn police station. She stated that she recognized defendant both by his physical appearance and by his voice. Subsequent to the lineup, she viewed a group of photographs and selected defendant's photograph from the group. She stated that

in the photograph, defendant did not have a mustache. According to the witness, she was shown a red napkin. She informed the police officers that she had a napkin like the one shown to her at her home and, after a check of her home, she told the officers that the red napkin was missing from her home.

Detective Earl Thul of the Cicero police department stated that on August 10, 1980, he and his partner, Detective Robert Wilson, took the victim to the police station for questioning. He stated that the prosecutrix was unable to identify any of the photographs which she was shown. Thul stated that Detective Wilson obtained a statement from the victim concerning her version of the events of the early morning hours of August 10. Thul stated that he was aware that the Cicero police department was engaged in some type of surveillance operation, but subsequently learned that defendant was the subject of the surveillance operation. Thul stated that he did not know whether defendant's photograph was in the mug book which was shown to the victim. The witness testified that his involvement with the case ended after he prepared a written report based upon his interview with the victim.

Detective Leonard Rutka of the Cicero police department and Detective Frank Marzullo of the Berwyn police department testified concerning the surveillance of defendant. Marzullo stated that defendant had been under police surveillance for approximately 10 weeks preceding defendant's arrest on September 20, 1980, and that the surveillance involved several law enforcement agencies including the Cicero and Berwyn police departments. On August 9, 1980, Marzullo stated that he observed defendant with a bandage on his hand at the time defendant left the emergency room at Hines Hospital. Marzullo testified that in the early morning hours of August 10, 1980, he was engaged in the surveillance of defendant. He stated that at 2:30 a.m., he observed defendant exiting a tavern near Cermak Road and Central Avenue in Cicero. He stated that the last time he saw defendant on that morning was when he observed defendant driving eastbound on Cermak Road. Marzullo testified that the following day he learned that a rape had occurred between the hours of 3:30 and 5 a.m. on August 10. Detective Rutka testified that on August 11 or 12, 1980, he was assigned to investigate the rape of the victim. He stated that the instant offense had the same "M.E.R.O." as other offenses believed to have been committed by defendant. He testified that he did not show defendant's photograph to the victim because defendant was a suspect and that if defendant was apprehended, the police wanted a live lineup. He also stated that with the police surveillance, they had

hoped to apprehend defendant during the commission of a crime. Rutka stated that the surveillance of defendant ended on September 20 with the arrest of defendant.

Rutka also testified concerning the lineup identification of defendant by the victim on September 20, 1980. He stated that initially a "voice lineup" was held and that the victim "almost passed out" when she heard defendant speak. The victim stated that she recognized defendant by "his height, his build, his eyes, the way he looked." Immediately after defendant was identified by the prosecutrix in a lineup, Rutka showed the victim photographs of defendant. The victim stated that there was something different about defendant. The victim then identified defendant's photograph and stated that defendant had a mustache and was light complected. Defense counsel then asked Rutka: "You said that, or she said that?" Rutka responded that "She wasn't so sure; she viewed the lineup. She wasn't so sure that was the man that raped her." The court sustained an objection by the State to the foregoing. Rutka then testified that the victim stated that "she was sure that was the man but there was something different about him; even though she said something was different, she said that was the man."

Detective Anthony Cutrone of the Berwyn police department testified that at the time defendant was arrested on September 20, the police recovered a red table napkin from the rear seat of defendant's automobile. He stated that the victim was shown this napkin after the identification of defendant by the victim on September 20. The victim told the officers that she had acquired such a napkin at a restaurant. After checking her home, she informed the police that the napkin was missing.

A forensic scientist testified that he analyzed the underwear of the complaining witness which she gave to the police after she was taken to the hospital following the rape. The witness also analyzed the saliva and blood of the victim and defendant and compared the results to the findings based upon his analysis of the victim's underwear. The witness stated that, in his opinion, the seminal fluid recovered from the victim's underwear could have been that of defendant. He stated that the secretions found in the victim's underwear was compatible with defendant's blood type.

Defendant's mother testified for the defense. She stated that defendant did not own any T-shirts like the one described by the victim. She also stated that she had acquired the napkin at a restaurant in Itasca, Illinois, and that the napkin was left in the automobile. She also stated that defendant is 6 feet 1 inch tall and weighs about 200

pounds.

The court found defendant guilty of rape, home invasion and two counts of deviate sexual assault. Defendant was sentenced to four concurrent terms of 30 years based upon the four convictions. Defendant appeals.

Defendant first argues that the State failed to establish defendant's guilt beyond a reasonable doubt. In particular, defendant maintains that the State failed to establish his identity as the intruder in the victim's home. Defendant points to the discrepancy between his height and weight as described by the victim and as described by the mother of defendant. He also argues that the certainty of the victim's identification is put into doubt because the prosecutrix requested to view photographs after the lineup.

In a bench trial, the court is the trier of fact. (*People v. Williams* (1981), 96 Ill. App. 3d 8, 420 N.E.2d 710.) Accordingly, the credibility of the witnesses, the weight to be afforded their testimony and the inferences to be drawn from the testimony are matters for the trial court. (*People v. Lofton* (1977), 69 Ill. 2d 67, 370 N.E.2d 517.) A court of review will not substitute its judgment for the trier of fact on questions involving the weight of the evidence and the credibility of witnesses and will not reverse a criminal conviction unless the evidence is so improbable as to raise a reasonable doubt of defendant's guilt. (*People v. Manion* (1977), 67 Ill. 2d 564, 367 N.E.2d 1313, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) In addition, the testimony of a single, credible eyewitness who had the opportunity to observe the defendant under circumstances which would permit a positive identification is sufficient to convict, even though the testimony of the eyewitness is contradicted. *People v. Sangster* (1982), 91 Ill. 2d 260, 437 N.E.2d 625.

In the instant case, the victim identified defendant at a lineup and the record indicates that she identified defendant based upon his voice. At the time of the lineup, she informed the police officers that there was something different about defendant and, upon viewing photographs, stated that defendant did not have a mustache in the photograph. The victim also identified a red table napkin which was found in the rear seat of defendant's automobile. Other evidence placed defendant in the vicinity of the victim's home at approximately the same time as the offenses. The victim stated that the intruder's right hand was bandaged and Detective Marzullo stated that on the day before the offenses, he observed defendant leave a hospital with his hand in a bandage. Finally, the forensic scientist's testimony indicated that the seminal secretions recovered from the complainant's

underwear could have originated from defendant. Our review of the record in the instant case leads us to conclude that the evidence is not so improbable as to raise a reasonable doubt as to defendant's guilt.

Defendant next argues that he was denied effective assistance of counsel. Defendant maintains that the record discloses that defense counsel failed to establish a proper rapport with the trial judge because defense counsel requested a continuance because counsel had a scheduling conflict. Defendant also asserts that defense counsel was unprepared for trial because counsel had not obtained certain discovery material from the State.

■ The test for determining whether defendant was denied his right to effective assistance of counsel is whether defendant's attorney was actually incompetent and caused substantial prejudice to defendant such that the outcome of the case was probably changed. (*People v. Talley* (1981), 97 Ill. App. 3d 439, 422 N.E.2d 1084.) In evaluating the quality of representation afforded defendant, it is necessary to examine the totality of counsel's conduct at trial. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) In the instant case, it does not appear from the record that defendant was denied his right to effective assistance of counsel. A review of the record discloses that counsel was sufficiently familiar with the case to provide adequate representation of defendant. Counsel made objections to testimony, adequately cross-examined witnesses and made appropriate motions. The mere fact that counsel had a scheduling conflict with other cases does not necessarily indicate that counsel was unprepared for trial, especially where, as in this case, the record indicates the contrary.

Defendant's final contention is that the trial court erred in refusing to overrule an objection made by the State during the cross-examination of Detective Rutka. Defense counsel was questioning Rutka as to why the victim was shown photographs following her identification of defendant in the lineup. Rutka stated that after she identified defendant, the victim stated that "There is something a little bit different about this guy." When she was asked what the difference was, the victim responded that "He's got a mustache and he was light complected." Counsel asked Rutka "You said that or she said that?" Rutka responded "She wasn't so sure; she viewed the line-up. She wasn't so sure that was the man that raped her." An objection to the foregoing was sustained. Counsel then asked Rutka "Did you tell her she was sure that was aman [*sic*] or she wasn't sure?" Rutka stated that "She said she was sure that was the man but there was something a little different about him; even though she said that was the man." Defendant maintains that the objection was improperly sus-

tained because testimony in the form of an opinion which is otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact. See *Wilson v. Clark* (1981), 84 Ill. 2d 186, 417 N.E.2d 1322.

■ Contrary to defendant's assertion, the trial court did not state the reason for sustaining the State's objection to the question. It does not appear from the colloquy that the court sustained the objection because it was opinion testimony; rather, it appears that the objection was sustained because Rutka's answer was not responsive to the question. The question sought to determine whether it was Rutka or the victim who stated that the difference in defendant's appearance was that "he's got a mustache and he was light complected." Therefore, we hold that there was no error in the trial court's sustaining the objection to the question by defense counsel.

Accordingly the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

BUCKLEY, P.J., and McGLOON, J., concur.